IN THE CIRCUIT COURT FOR ST. LOUIS COUNTY
STATE OF MISSOURI

2009 OCT -2 PM 4: 20

JOA... M. SIL...R
CIRCUIT CLERK

SOLUTIA INC., )
)
    Plaintiff, )
)   Case No. 09SLCC04784
v. )
)   Div.
)
ESIS, INC., )
    Serve at: )
    CT Corporation System )
    120 South Central Ave. )
    Clayton, MO 63105 )
)
    Defendant. )   **JURY TRIAL DEMANDED**

## PETITION

    COMES NOW Plaintiff Solutia Inc. ("Solutia"), by and through its undersigned

attorneys, and for its Petition against Defendant ESIS, Inc. ("ESIS"), hereby states as follows:

### Parties

    1.    Solutia is a Delaware corporation with its principal place of business located at

575 Maryville Centre Drive, St. Louis, Missouri 63141.

    2.    Upon information and belief, ESIS is a Pennsylvania corporation with its

principal place of business located at 436 Walnut Street, Philadelphia, Pennsylvania 19106.

    3.    ESIS has entered into multiple contracts with Solutia within the State of Missouri.

Additionally, ESIS transacts business within this State by providing its claims adjusting, loss

control and risk management services here. ESIS has also damaged Solutia by breaching its

fiduciary duty to Solutia and by negligently performing its claims adjusting services, constituting

the commission of tortious acts within this State.

1483195.02



## Jurisdiction and Venue

4.      This Court has jurisdiction over this matter pursuant to Section 506.500 of the Revised Missouri Statutes in that ESIS has transacted business within the State of Missouri, has entered into contracts within the State of Missouri, and has committed tortious acts within the State of Missouri.

5.      Venue is proper in this Court under Section 508.010.4 of the Revised Missouri Statutes, in that this Petition contains a count alleging a tort, and Solutia was first injured in St. Louis County, Missouri. Further, regardless of Solutia's place of injury, venue is proper under Section 508.010.5 of the Revised Missouri Statutes, in that ESIS is an out-of-state corporation with its registered agent located in St. Louis County, Missouri.

## General Allegations

6.      Solutia creates and manufactures performance materials for use primarily in the automotive, architectural, transportation and industrial markets. Though headquartered in St. Louis, Missouri, Solutia maintains manufacturing and other offices at various places throughout the United States and abroad.

7.      ESIS provides third-party administrator services on behalf of its corporate clients, investigating, adjusting and otherwise administering various workers' compensation claims made against ESIS's clients. In performing its duties, ESIS works with its clients and their insurance companies to resolve and dispose of any litigated claims. In this capacity, ESIS assures clients that its representatives know the local laws where claims occur. On many occasions, ESIS also secures local attorneys to represent its corporate clients.

8.      ESIS has a longstanding relationship with Solutia as its third-party administrator for workers' compensation claims. ESIS became Solutia's third-party administrator for workers'

2

compensation claims when Solutia became an independent corporate entity in 1997. Prior to 1997, ESIS was the third-party administrator for Monsanto, Solutia's predecessor. As Solutia's third-party administrator, ESIS was charged with handling all aspects of workers' compensation claims against Solutia.

9.      ESIS was serving as Solutia's third-party administrator pursuant to a contract between Solutia and ESIS for claims which occurred between April 1, 2000 and March 31, 2001 (hereinafter referred to as the "ESIS Service Agreement"). A true and accurate copy of the ESIS Service Agreement is attached hereto as Exhibit 1. This ESIS Service Agreement was drafted by ESIS and was substantially similar to agreements that had been in place since 1997.

10.     The ESIS Service Agreement provided that ESIS would provide Claims Adjusting Services to Solutia for all Claims occurring during the effective dates of the ESIS Service Agreement.

11.     Pursuant to the ESIS Service Agreement, a "Claim" is defined as "monetary demand against [Solutia] based upon each itemized loss or damage occurring in the United States or Canada..., resulting from ... bodily injury, sickness, or disease (including death resulting therefrom)," assuming that the occurrence giving rise to the demand took place while the ESIS Service Agreement was in effect, that Solutia reported the demand to ESIS in a timely manner, and that the ESIS Service Agreement did not otherwise exclude the reported occurrence.

12.     Under the ESIS Service Agreement, once a Claim was reported to ESIS, ESIS' obligations were as follows:

> a.      Investigate, adjust, and otherwise administer claims, including the arrangement of a defense for litigated Claims, as ESIS deems necessary in accordance with ESIS' best professional judgment as a claims adjuster and state laws and regulations permit for monopolistic states....

3

b.      Review the facts of each Claim and the law applicable thereto to determine what compensation, if any, should be paid on the Client's behalf for each Claim....

c.      Determine what Allocated Loss Expenses shall be incurred in the investigation, adjustment, administration, and defense of each Claim.

d.      Make payments for settlement of Claims and for Allocated Loss Expenses out of funds provided by the Client to ESIS....

e.      Maintain a file on reported Claims....

f.      Dispose of Claim files in accordance with the Client's directions or, in the absence of such directions, at ESIS' discretion as permitted by applicable state and federal laws....

g.      Provide statistical or loss experience reports to the Client concerning the status of (a) Claims, (b) Claim reserves, and (c) Claim payments as agreed upon by ESIS and the Client in writing from time to time.

h.      Maintain confidentiality with respect to the contents of the Client's files such that the contents thereof are not disclosed to third parties, except as shall be required for ESIS to carry out its obligations under this PART or to comply with requirements imposed by applicable laws or regulations.

i.      Administer all Claims reported to their conclusion and further investigate, adjust, and otherwise administer any Late Reported Claims according to the terms and conditions of this PART.

See Exhibit 1, § II.A.3.

13.      In or around May of 2002, Fannie Ranaldson ("Ranaldson"), an employee at Solutia's Pensacola, Florida plant, notified Solutia of her belief that her work for Solutia had caused her to suffer certain lung-related illnesses in March of 2001.

14.      Because the diagnosis of Ranaldson's lung-related illnesses occurred during the time the ESIS Service Agreement was in effect, ESIS had the contractual responsibility to manage her claim pursuant to the ESIS Service Agreement.

15.      Ranaldson asserted a monetary demand against Solutia based upon damage occurring in the United States resulting from her lung-related illness (the "Ranaldson Claim").

4

16. Solutia reported the Ranaldson Claim in a timely manner to ESIS and provided funds to ESIS for the purpose of establishing a reserve for the payment of medical bills and other Claim-related expenses, pursuant to the ESIS Service Agreement.

17. The ESIS Service Agreement did not otherwise exclude the reported occurrence.

18. Ranaldson's demand constituted a Claim pursuant to the ESIS Service Agreement.

19. Pursuant to Florida law, which was applicable to the Ranaldson Claim and request for medical treatment, an employer and/or insurance carrier may initiate payment of benefits "without prejudice and without admitting liability." Fla. Stat. § 440.20(4). However, if the employer/carrier "fails to deny compensability within 120 days after the initial provision of benefits or payment of compensation," the employer/carrier "waives the right to deny compensability." Id.

20. On or around June 17, 2002, ESIS began making payments from the funds provided by Solutia, in its capacity as Solutia's Claims Adjuster under the ESIS Service Agreement, for all medical treatment rendered to Ranaldson for her lung-related illnesses.

21. Between June, 2002 and March, 2005, ESIS continued to make payments for medical treatment rendered to Ranaldson. The majority of those payments were related to treatment Ranaldson received from Dr. Salvadore Vernali.

22. Dr. Vernali treated Ranaldson for mild asbestosis, a condition allegedly related to her work at Solutia, and Chronic Obstructive Pulmonary Disorder ("COPD"), a condition which unquestionably could not have been related to Ranaldson's work at Solutia.

23. Despite the fact that Dr. Vernali's opinion that most of Ranaldson's complaints were related to her COPD, which was not work-related and were instead caused by her smoking,

5

ESIS paid for almost three years of treatment by Dr. Vernali, regardless of whether the treatments were related to Ranaldson's non-work-related COPD or Ranaldson's mild asbestosis.

24.     Prior to March 18, 2005, ESIS never denied the compensability of Ranaldson's Claim and never denied payment for any medical bills submitted by Ranaldson, including those bills related to treatment of her non-work related COPD.

25.     On or about March 18, 2005, Ranaldson filed a Petition for Benefits with the Florida Division of Workers' Compensation ("Work Comp. Matter"), alleging she was permanently and totally disabled as a result of the lung-related illnesses Ranaldson claimed were related to her work with Solutia.  ESIS secured counsel in Florida to represent Solutia in the Work Comp. Matter pursuant to its obligation to arrange "a defense for litigated Claims. . . ."

26.     On September 19, 2005, a hearing was held in the Work Comp. Matter.  At the hearing, the Court took into account in its findings of fact the deposition testimony from Dr. Vernali, Ms. Ranaldson's treating physician.

27.     On October 10, 2005, the Judge of Compensation Claims in the Work Comp. Matter issued his ruling in favor of Ranaldson and against Solutia, holding Ranaldson was permanently and totally disabled and Solutia would be responsible for paying permanent total disability benefits to Ranaldson ("October 10, 2005 Order").  A true and correct copy of the October 10, 2005 Order is attached hereto as Exhibit 2.

28.     In his Order, the Court made several findings of fact related to the testimony of Dr. Vernali.  Among other things, the Court noted that Dr. Vernali had concluded that Ranaldson's alleged shortness of breath was predominantly caused by her COPD; that any work restrictions he assigned to Ranaldson were attributable to COPD and not asbestosis, that

6

Ranaldson's chronic respiratory complaints were related to her COPD and were not related to asbestosis; and that Ranaldson's COPD was not work-related. See Exhibit 2, pp. 5-7.

29.     The Court held that, though the medical evidence tended to show Ranaldson's disability was unrelated or only very slightly related to Ranaldson's work for Solutia, Solutia was responsible for paying permanent total disability benefits because Solutia had failed to deny Ranaldson's claim within 120 days of the date Solutia first provided medical treatment to Ranaldson, pursuant to the Florida statute cited above and known as the "120-day rule."

30.     Specifically, the Court concluded that, by paying for Ms. Ranaldson's medical expenses for COPD for three years, it "has accepted that condition as compensable and has not made the requisite showing that they have now discovered information which could not have been discovered within 120 days." See Exh. 2.

31.     The Order of the Florida Judge of Compensation Claims was affirmed on appeal, in a per curiam opinion, by the Florida First District Court of Appeal on October 25, 2006.

32.     As a result of ESIS' failure to deny the Ranaldson Claim within 120 days, Solutia is required to pay permanent total disability benefits to Ranaldson beginning on May 26, 2005 for the rest of Ms. Ranaldson's life. Ranaldson's court-ordered permanent total disability benefits amount to One Thousand, Four Hundred Forty-Eight Dollars and Forty-Six Cents ($1,448.46), payable every two weeks.

33.     In addition, Solutia must pay Ranaldson's medical expenses related to her alleged lung illnesses. To date, Solutia has incurred more than One Hundred Thousand Dollars ($100,000.00) in medical expenses related to the Ranaldson Claim and has paid over Two Hundred Thousand ($200,000.00) in permanent total disability benefits to Ranaldson. Over the

7

course of Ranaldson's lifetime, Solutia expects that it will pay more than One Million Dollars ($1,000,000.00) either to or on behalf of Ranaldson in relation to her Claim.

34.    ESIS unilaterally determined that it would make payments for the medical treatment rendered to Ranaldson from approximately May, 2002 until at least March, 2005.

35.    ESIS was responsible for any investigation into Ranaldson's alleged injury and treatment to determine whether the treatment was for a work-related illness.

36.    ESIS made payments for all bills submitted by Ranaldson, without regard to whether they were for treatment related to a work-related condition.

37.    ESIS disregarded the Florida "120-day rule" and continued to pay Ms. Ranaldson for non-work related illnesses for more than 120 days.

### Count I--Breach of Contract

38.    Solutia incorporates and realleges the allegations contained in Paragraphs 1-38 of its Petition as if fully set forth herein.

39.    In exchange for the claims adjusting services provided by ESIS pursuant to the ESIS Service Agreement, Solutia paid ESIS certain fees set forth in the ESIS Service Agreement.

40.    The ESIS Service Agreement required ESIS to use its best professional judgment as a claims adjuster to investigate, adjust and otherwise administer Claims.  See Exhibit 1, § II.A.3.a.

41.    The ESIS Service Agreement also required ESIS to "[r]eview the facts of each Claim and the law applicable thereto to determine what compensation, if any, should be paid on the client's behalf for each Claim."  See Exhibit 1, § II.A.3.b.

8

42.    Had ESIS investigated the Ranaldson Claim as required by the ESIS Service Agreement, ESIS would have discovered that the majority of Ranaldson's medical bills were for treatment for a non-work-related illness.

43.    ESIS breached its contractual obligation to Solutia by its failure to provide even minimal investigation into the medical bills for the Ranaldson Claim.

44.    Had ESIS known "the law applicable" to Ranaldson's claim, ESIS would have known that Florida law requires the employer to deny a workers' compensation claim within 120 days of the first provision of medical treatment, or the claim is deemed compensable.

45.    ESIS breached its contractual obligation to Solutia by its lack of knowledge of Florida workers' compensation laws.

46.    The ESIS Service Agreement further charges ESIS with the responsibility to "[i]nvestigate, adjust, and otherwise administer claims, including the arrangement of a defense for litigated Claims, as ESIS deems necessary in accordance with ESIS' best professional judgment as a claims adjuster and state laws . . ."

47.    Had ESIS complied with the terms of the ESIS Service Agreement and investigated the Ranaldson Claim and arranged for a defense of the Ranaldson Claim, Solutia would not have been held liable for Ranaldson's permanent total disability benefits for failure to deny the Ranaldson Claim prior to the expiration of 120 days from the date ESIS first paid benefits for Ranaldson's non-work-related medical treatment.

48.    ESIS' failure to investigate the Ranaldson Claim, its failure to know Florida law and its decision to pay Ranaldson's non-work related medical bills for more than 120 days constitute breaches of the ESIS Service Agreement.

9

49.   As a result of ESIS' breaches of the ESIS Service Agreement, Solutia has been damaged in that Solutia has paid medical expenses for non-work related illnesses, and has paid and is required to continue to pay permanent total disability benefits to Ranaldson for the rest of Ranaldson's life.  In addition, Solutia has incurred costs and attorneys' fees in this suit and in appealing the Order of the Florida Judge of Compensation Claims that would not have been incurred had ESIS properly denied Ranaldson's Claim within 120 days of first providing medical treatment to Ranaldson.

WHEREFORE, Plaintiff Solutia Inc. respectfully requests that this Court enter its Judgment on Count I of Solutia's Petition in favor of Solutia and against Defendant ESIS, Inc., that this Court award damages to Solutia in an amount to be determined but in excess of $1,000,000.00, and for such other and further relief as this Court deems just and proper.

## Count II--Breach of Fiduciary Duty

50.   Solutia incorporates and realleges the allegations contained in Paragraphs 1-38 of its Petition as if fully set forth herein.

51.   ESIS is in the business of providing claims adjusting services to its clients.

52.   Pursuant to the ESIS Service Agreement, ESIS provided claims adjusting services to Solutia.

53.   ESIS has the skill and ability as a claims adjuster to investigate, adjust, and otherwise administer claims, to review the facts of each claim and the applicable law to determine what compensation (if any) to pay on behalf of its clients relating to each claim, and to administer all claims reported to their conclusion, including the skill and ability to hire counsel to defend ESIS's clients against claims.

10

54.    ESIS offers its skills and abilities as a claims adjuster to clients like Solutia, who contract with ESIS for ESIS' claims adjusting services.

55.    The ESIS Service Agreement grants ESIS the "full authority and control in all matters pertaining to the investigation, adjustment, and administration of Claims" covered by the ESIS Service Agreement. See Exhibit 1, §II.A.5.

56.    In relation to all Claims reported to ESIS and particularly in relation to the Ranaldson Claim, Solutia relied upon ESIS because of ESIS' superior skill and knowledge in regard to claim adjusting and gave ESIS the full authority and control over all matters pertaining to the investigation, adjustment and administration of the Ranaldson Claim, including giving ESIS full authority and control over hiring counsel to contest the Ranaldson Claim.

57.    Solutia's reliance upon ESIS to properly administer the Ranaldson Claim gave rise to a fiduciary relationship between Solutia and ESIS, such that ESIS owed fiduciary duties to Solutia.

58.    ESIS paid, on Solutia's behalf and from Solutia's funds, for all of Ranaldson's submitted medical bills for a period of approximately three years, notwithstanding the fact that the majority of these bills were for a non-work related  illness.  ESIS's improper payments subjected Solutia to the application of Florida's 120-day rule.

59.    Because of ESIS's failure to properly investigate and properly pay for only work-related claims, Solutia was found liable to pay Ranaldson permanent total disability benefits because the Florida Judge of Compensation Claims found that Solutia had failed to deny Ranaldson's Claim within 120 days of the date Solutia first provided medical treatment to Ranaldson.

60.     ESIS also had a fiduciary obligation to know the workers' compensation laws where claims were made.

61.     ESIS' lack of knowledge regarding the applicability of the 120-day rule and its continued payments despite the applicability of the 120-day rule were breaches of ESIS' fiduciary duty to Solutia.

62.     As a result of ESIS' breach of fiduciary duty, Solutia has been damaged in that Solutia has paid medical expenses for non-work related illnesses, and has paid and is required to continue to pay permanent total disability benefits to Ranaldson for the rest of Ranaldson's life. In addition, Solutia has incurred costs and attorneys' fees in this suit and in appealing the Order of the Florida Judge of Compensation Claims that would not have been incurred had ESIS properly denied Ranaldson's Claim within 120 days of first providing medical treatment to Ranaldson.

WHEREFORE, Plaintiff Solutia Inc. respectfully requests that this Court enter its Judgment on Count II of Solutia's Petition in favor of Solutia and against Defendant ESIS, Inc., that this Court award damages to Solutia in an amount to be determined but in excess of $1,000,000.00, and for such other and further relief as this Court deems just and proper.

## Count III--Negligence

63.     Solutia incorporates and realleges the allegations contained in Paragraphs 1-55 of its Petition as if fully set forth herein.

64.     ESIS had a duty to administer and adjust the Ranaldson Claim in the manner of an entity reasonably skilled in claims adjusting.

65.     A reasonably skilled claims adjuster working with clients in the state of Florida would have recognized that Ranaldson's claims associated with COPD were not compensable as

12

a work-related injury or illness, and that the failure to deny a non-compensable Florida workers' compensation claim within 120 days of first providing medical treatment to the claimant would lead to the application of Florida's 120-day rule, which prohibits the employer from later denying compensability.

66. ESIS' failure to investigate Ranaldson's claims to determine whether they were related to a work-related illness and ESIS' failure to deny compensability of the Ranaldson Claim within 120 days of first providing medical treatment to Ranaldson subjected Solutia to the application of Florida's 120-day rule and therefore breached ESIS' duty to act as a reasonably skilled claims adjuster.

67. But for ESIS' failure to deny compensability of the Ranaldson Claim within 120 days of first providing medical treatment to Ranaldson, the Florida Judge of Compensation Claims could not have relied upon the 120-day rule in finding Solutia liable to Ranaldson for permanent total disability benefits.

68. As a result of ESIS' negligence in failing to deny compensability of the Ranaldson Claim within 120 days of first providing medical treatment to Ranaldson, Solutia has been damaged in that Solutia has paid medical expenses for non-work related illnesses, and has paid and is required to continue to pay permanent total disability benefits to Ranaldson for the rest of Ranaldson's life. In addition, Solutia has incurred costs and attorneys' fees in this suit and in appealing the Order of the Florida Judge of Compensation Claims that would not have been incurred had ESIS properly denied Ranaldson's Claim within 120 days of first providing medical treatment to Ranaldson.

WHEREFORE, Plaintiff Solutia Inc. respectfully requests that this Court enter its Judgment on Count III of Solutia's Petition in favor of Solutia and against Defendant ESIS, Inc.,

13

that this Court award damages to Solutia in an amount to be determined but in excess of $1,000,000.00, and for such other and further relief as this Court deems just and proper.

Respectfully Submitted,

LEWIS, RICE & FINGERSH, L.C.

Thomas P. Berra, Jr., #43399
tberra@lewisrice.com
Duane L. Coleman, #35898
dcoleman@lewisrice.com
Lynn S. Brackman, #50924
lbrackman@lewisrice.com

500 N. Broadway, Suite 2000
St. Louis, Missouri 63102
(314) 444-7600
(314) 241-6056 *facsimile*

Attorneys for Plaintiff
Solutia Inc.

14

# ESIS SERVICE AGREEMENT

(This is not a contract of insurance.)

**Note:  The following contract is a composite of provisions related to various services marketed by ESIS, Inc. SECTION I contains general provisions that apply to all parts of the contract.  Subsequent sections contain definitions and provisions that are only applicable to the specific service described within that PART.  The Client agrees that ESIS may meet it obligations described in this Agreement by engaging, at its reasonable discretion, cost, and on the Client's behalf, the services of persons or firms outside of ESIS, Inc., including the personnel of Insurance Company of North America.**

# SECTION I - LIST OF INCLUDED SERVICES; GENERAL PROVISIONS AND DEFINITIONS

**PART A - CONTRACTING PARTIES:**  This Agreement is entered into by and between ESIS ("ESIS"), a California Corporation with an office at 525 W. Monroe St., Chicago, IL 60661, and Solutia, Inc. (the "Client") with offices at Maryville Centre Drive, St. Louis, MO 63166.

**PART B - SERVICES PROVIDED:**  In consideration of the fees listed in SECTION III, ESIS and the Client hereby agree that ESIS will provide the following services to the Client according to the General Provisions and the specific provisions of the applicable numbered PARTS of SECTION II.

| Part | Service | Billing Numbers |
|------|---------|-----------------|
| A | Claims Adjusting Services – Occurrence | 4297 4298 4314 |
| B | Claims Adjusting Services – Reported | 4314 |
| C | Loss Control Services | 56-405 |
| D | Risk Management Information Systems (RMIS) | 70842 |

**PART C - DEFINITIONS:**  The following definitions are common to all contracts:

1.  **Cancellation** shall mean the termination of this Agreement prior to its expiration.

2.  **ESIS Fee** means the amount of compensation owed by the Client to ESIS in accordance with this Agreement for specific services rendered.

3.  **Expiration** shall mean the termination of this Agreement at the end of the stated term or renewal hereof.

**PART D - OBLIGATIONS AND RIGHTS OF ESIS:**  ESIS will provide services as indicated in the PARTS above.  See specific "Obligations of ESIS" in SECTION II of this Agreement.

Exhibit

1

**PART E - OBLIGATIONS OF CLIENT:** The Client shall pay to ESIS the amount of any taxes or assessments which may be imposed upon the Client's purchase of the services provided by ESIS pursuant to this Agreement, and where required by law, said taxes or assessments shall be charged to the Client by ESIS in addition to all other fees for compensation payable to ESIS hereunder.

**PART F - GENERAL PROVISIONS:**

1. SECTION II contains a number of separate PARTS. When a PART is included in the list of SERVICES PROVIDED (SECTION I, PART B), and a fee is shown for those services in SECTION III, then the provisions of those PARTS are included in their entirety and, with SECTIONS I and III, form the entire Agreement. The effective dates and contract periods listed in each PART of SECTION II apply to that PART only. The ESIS SERVICE AGREEMENT shall remain in effect until the cancellation, expiration, or completion of all PARTS.

2. ESIS shall have the right to commingle and deposit in banking accounts, and retain any interest earned thereon, any and all monies which the Client pays to ESIS, including monies for Claim settlements, Allocated Loss Expenses, or compensation paid in advance for services to be rendered by ESIS to the Client.

3. If the Client shall fail to pay any ESIS fee as charged by ESIS within ten (10) days of receipt of ESIS' invoice, ESIS shall have the right to suspend service until such payments are made. The Client agrees to indemnify ESIS and hold it harmless for the full amount of any liability, fees, fines, assessments, judgments, or penalties resulting from an interruption or cessation of ESIS' services which resulted by reason of the Client's failure to pay to ESIS any fee as required hereunder and for the amount of any administrative or legal expenses incurred by ESIS in defending any such action.

4. If the Client fails to make timely payments of any monies owed by the Client to ESIS, whether for Claim settlements, Allocated Loss Expenses, or compensation for services rendered, ESIS may charge the Client interest for late payment at the rate of 1%(one percent) per month. If ESIS shall incur collection expenses in obtaining monies from the Client which are owing to ESIS, the Client shall reimburse ESIS in full for such expenses.

5. This Agreement is for the sole benefit of the parties hereto. The terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns; provided, however, that this Agreement may not be assigned by the either party without the other party's prior written consent. This Agreement and its attachments and addenda are the entire Agreement by and between the parties with respect to the services described herein.

6. This Agreement or any individual PARTS hereto may be canceled by either party for any reason whatsoever by giving sixty (60) days prior written notice to the other party.

7. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

8. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall be ineffective as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement and without affecting the validity or enforceability of such provision in any other jurisdiction.

9. The interests of the responsible party hereto shall not be prejudiced by an inadvertent error or omission which may occur in the preparation, application, or use of this Agreement; provided, however, that, upon discovery of any such error or omission, rectification thereof is made by the party responsible for such error or omission as promptly as practicable.

# SECTION II - SERVICE SPECIFICATIONS

The following detailed specification(s) shall be provided by ESIS as agreed in SECTION I, PART B above.

## PART A. - CLAIMS ADJUSTING SERVICES (OCCURRENCE)

### BILLING NUMBER  4297 4298

ESIS and the Client hereby agree that ESIS will provide Claims Adjusting Services to the Client according to the following terms and conditions:

1.  **CLAIMS ADJUSTING SERVICES - EFFECTIVE DATES; RENEWALS:** This PART shall be effective with respect to Claims (as defined herein) resulting from occurrences during the period beginning 12:00 a.m. on April 01, 2000 and ending at 11:59 p.m. on March 31, 2001. However, upon the expiration of this PART and any renewal period or periods, ESIS shall continue to perform its obligations hereunder, on the terms set forth in SECTION III and any Addendum hereto, with respect to Claims arising from occurrences during the term of this PART, until all Claims under this contract have been paid or settled, all applicable statutes of limitations have run, and there is no further possibility that any additional Claims may arise.

2.  **CLAIMS ADJUSTING SERVICES - DEFINITIONS:**

    a.  **Allocated Loss Expenses** shall mean any cost or expense ESIS incurs on the Client's behalf as a result of ESIS' engaging the service of firms or persons outside ESIS' organization for work in connection with the investigation, adjustment, settlement, or defense of a Claim. Allocated Loss Expenses include, but is not limited to the following:  subrogation; automobile or other physical damage appraisal; all court costs, fees, and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of depositions and court reporters or recorded statements. Allocated Loss Expenses are not included in Claim Transaction Fees.

    b.  **Claim or Claims** shall mean each monetary demand against the Client based upon each itemized loss or damage occurring in the United States or Canada (or in such other locations as may be agreed upon by the parties and specified in an Addendum to this PART), resulting from physical injury to or destruction of tangible property, loss of the use of tangible property, bodily injury, sickness, or disease (including death resulting therefrom) if the demand:

        1)  results from or arises out of an accident or occurrence which takes place during the term of this PART, and;

        2)  is reported to ESIS by the Client on a timely basis, and;

        3)  is a Claim of the type described in SECTION III, but not excluded by SECTION II, PART A.6.b.

    c.  **Claim Fund** shall mean the funds which the Client makes available to ESIS for use in paying Allocated Loss Expenses and Claim payments, but excluding Special Billed items, on the Client's behalf. Claim payments in excess of this threshold shall be paid in accordance with the provisions of SECTION II, PART A.4.f. hereof.

d.  **Claim Transaction Fee** means the amount of compensation owed by the Client to ESIS in accordance with SECTION III of this Agreement.

e.  **Late Reported Claims** shall mean Claims which are within the definition of Claim and which are reported to ESIS after the cancellation or expiration of this PART and any renewals hereof.

f.  **Discretionary Settlement Authority Limit** shall mean the maximum amount of money which the Client is authorizing ESIS to spend without obtaining prior approval from the Client in order to settle any one Claim. Allocated Loss Expenses are not subject to nor included in the Discretionary Settlement Authority Limit. The Discretionary Settlement Authority Limit shall be established initially in the amount of $10,000 for Auto Liability, General Liability and Premises Liability type claims - Non-litigated; Zero (0) for General Liability and Premises Liability Litigated and Products Liability; $5,000 Statutory for Worker's Compensation type claims., and may be increased or decreased by the Client; provided, however, that in the event of any such increase or decrease, ESIS may modify the amounts of the Claim Transaction Fees.

g.  **Occurrence** means an event or series of events deemed by the Client to give rise to one of more Claims. It may include events which are either causative in nature, or the result of some cause or causes (such as the onset of disease, injury, or damage), or both. It is not intended to be the equivalent of any commonly used definition of the term as found in policies of insurance.

h.  **Special Billed Amounts** - The amount to be paid by ESIS in respect to any single Claim payment that exceeds $50,000.00 shall be specially billed to the Client and monies paid to ESIS before the check shall be issued by ESIS. ·

3.  **CLAIMS ADJUSTING SERVICES - OBLIGATIONS OF ESIS** - ESIS' obligations under this PART are to:

    a.  Investigate, adjust, and otherwise administer Claims, including the arrangement of a defense for litigated Claims, as ESIS deems necessary in accordance with ESIS' best professional judgment as a claims adjuster and state laws and regulations permit for monopolistic states. The Client agrees that ESIS may meet its obligations by engaging, at its reasonable discretion and on the Client's behalf, the services of persons or firms outside of ESIS' organizations.

    b.  Review the facts of each Claim and the law applicable thereto to determine what compensation, if any, should be paid on the Client's behalf for each Claim. ESIS shall obtain the Client's prior approval before offering to settle any Claim for an amount which exceeds the Discretionary Settlement Authority Limit, and ESIS shall incur no liability in excess of the Discretionary Settlement Authority Limit as a result of its failure to settle any Claim for an amount within the Discretionary Settlement Authority Limit.

    c.  Determine what Allocated Loss Expenses shall be incurred in the investigation, adjustment, administration, and defense of each Claim.

    d.  Make payments for settlement of Claims and for Allocated Loss Expenses out of funds provided by the Client to ESIS. However, ESIS shall have no responsibility to determine or notify the Client of exhaustion of the Client's deductible aggregate as defined in any policy of insurance.

    e.  Maintain a file on reported Claims. All Claim files will be the Client's property and will be available for inspection by the Client upon reasonable notice to ESIS. The Client may conduct, at no additional charge, one formal file review annually at a mutually agreed upon central location to review a representative number of Claim files. ESIS reserves the right to charge time and expenses involved in formal reviews beyond this standard allowance.

    f.  Dispose of Claim files in accordance with the Client's directions or, in the absence of such directions, at ESIS' discretion as permitted by applicable state and federal laws.

g.  Provide statistical or loss experience reports to the Client concerning the status of (a) Claims, (b) Claim reserves, and (c) Claim payments as agreed upon by ESIS and the Client in writing from time to time.

h.  Maintain confidentiality with respect to the contents of the Client's files such that the contents thereof are not disclosed to third parties, except as shall be required for ESIS to carry out its obligations under this PART or to comply with requirements imposed by applicable laws or regulations.

i.  Administer all Claims reported to their conclusion and further investigate, adjust, and otherwise administer any Late Reported Claims according to the terms and conditions of this PART.

4.  **CLAIMS ADJUSTING SERVICES - OBLIGATIONS OF THE CLIENT** - The Client's obligations under this PART shall be to:

a.  Refer promptly to ESIS each Claim which falls within the scope of this PART after the Client has received notice of such Claim.

b.  Pay to ESIS immediately upon execution of this PART the amount necessary to establish the Claim Fund, and maintain the appropriate balance for the duration of this PART.

c.  Pay to ESIS all Claim Transaction Fees and Claim Fund invoices according to the provisions of this PART. If the Client fails to pay such amounts according to the terms of this PART, ESIS shall have the right to claim a retaining lien on the Client's Claim files in ESIS' exclusive possession until all Claim Transaction Fees and Claim Fund invoices due are paid. This subsection shall survive the expiration or cancellation of this PART until all Claims are closed or some mutual agreement is reached by ESIS and the Client.

d.  Continue to remit sufficient monies to ESIS, upon presentation of an appropriate invoice, to allow ESIS to maintain the Claim Fund at all times at an amount sufficient to enable ESIS to pay Claims and Allocated Loss Expense payments as required by this PART. The Client agrees that "sufficient monies" as used in this paragraph shall   be a sum equal to the sum of

   1)  all Claim payments and Allocated Loss Expenses,  but excluding Special Billed amounts, paid by ESIS during the preceding ten (10) weeks; or

   2)  any other amount as may be mutually agreed upon by the Client and ESIS.

e.  ESIS may require the Client to increase the amount of the Claim Fund if the amount of the Claim Fund is insufficient in ESIS' estimation to pay Claims or Allocated Loss Expenses because of unusual circumstances beyond the scope of the standard formula. Moreover, if the Client does not reimburse the Claim Fund on a timely basis following ESIS' mailing of an invoice to the Client, ESIS may immediately require the Client to increase the Claim Fund to a level greater than the amount paid on the Client's behalf for Claim payments and Allocated Loss Expenses during the previous ten (10) week period. If the Client fails to make funds available to ESIS within ten (10) days after receipt of a Claim Fund invoice for payment of Claims and Allocated Loss Expenses in the amount required hereunder, ESIS may suspend its obligation to make such payments and all other Claims services provided by ESIS under this PART until ESIS shall receive funds from the Client for this purpose. The Client agrees that it will indemnify ESIS and hold it harmless for the full amount of any and all liability, fees, fines, assessments, judgments, or penalties resulting from an interruption or cessation of ESIS' Claims services which ESIS caused by reason of the Client's failure to reimburse the Claim Fund to the level required under paragraph D above, or to provide any additional monies for the Claim Fund which ESIS in its discretion may have requested pursuant to this paragraph.

    f.   Notwithstanding the other provisions of this PART, in the event that the amount to be paid by ESIS in respect to any single Claim payment shall exceed the Special Bill Amount, upon receipt of ESIS' invoice for this Special Billed Amount, immediately remit to ESIS the full amount of such payment as stated on the invoice. ESIS shall have no obligation to make such payment unless and until ESIS has received payment of this Special Billed Amount from the Client.

## 5. CLAIMS ADJUSTING SERVICES - GENERAL PROVISIONS:

    a.   ESIS shall have full authority and control in all matters pertaining to the investigation, adjustment, and administration of Claims covered by this PART, subject to any limitations which ESIS and the Client may have agreed upon as set forth in this agreement or in any Addendum to this PART agreed to and duly executed by both parties hereto.

    b.   When and as necessary in ESIS' judgment, ESIS shall have the right to communicate directly with the insurance carrier which is providing coverage to the Client in excess of the amount of the Client's deductible or self-insured retention. ESIS may provide information to any such insurance carrier, including data which relates to any open or closed Claim or loss, regardless of whether such Claim is likely to result in liability to that insurance carrier. When directed by the Client to a specific policy, ESIS shall give notice to the designated ACE insurance company of the existence of an individual Claim. As between ESIS and the Client, the Client shall have the sole responsibility to determine whether and when Claims handled on the Client's behalf and Allocated Loss Expenses incurred on the Client's behalf under this PART equal or exceed, or are likely to equal or exceed, any specific limit or any aggregate limitation applicable to the Client's coverage or deductible/self-insured retention under the terms of the Client's insurance policy or policies.

    c.   In the case of any Claim in which the date of the Occurrence or any element thereof is not known or could be disputed factually or legally but which is otherwise within the scope of this PART, ESIS will accept the date or dates assigned by the Client. It is agreed that such acceptance is not an express or implied agreement by ESIS or its agents or employees that the selection of the date or dates of Occurrence is correct in fact or as a matter of law. If the Client and ESIS have, at any time, entered into more than one Claim Service Agreement covering different time periods, acceptance by ESIS of the Client's designated date of Occurrence is not an express or implied agreement that the Client's allocation among its contracts is correct in fact or law. No action of ESIS or its agents or employees shall be construed as an admission or opinion on any issue of fact or law or date or dates of events which may be relevant to the obligations of any insurance company, including the concept of occurrence as used in policies of insurance.

    d.   It is understood that ESIS is affiliated with certain insurance company affiliates of the ACE Companies. Since the Client may or may not consider its Claims referred to ESIS as relevant to an insurance program with one or more of these companies, the Client must identify each Claim individually to a specific policy if the Client believes the Claim to be covered. ESIS claims adjusters will have no affirmative duty to participate in determination of coverage under any insurance policy.

## 6. CLAIMS ADJUSTING SERVICES - FEES:

    a.   ESIS shall impose a Claim Transaction Fee charge for each Claim reported by the Client to ESIS. For occurrences which generate more than five Claims, ESIS' Claim Transaction Fee will be fifty percent (50%) of the stated fee for each Claim reported after the first five such Claims. If more than twenty-five Claims result from any one occurrence, ESIS' fee will be the standard charge for the first five Claims and fifty percent (50%) of the standard fee charge for the next twenty Claims, and all additional Claims arising from such occurrence shall be calculated on the basis of time spent and expenses incurred by ESIS with respect to them at a rate that shall be agreed upon in writing.

b. General Liability Claims Transactions Fees as set forth herein shall not be applicable to Claims arising from or related to pollution, toxic material, or environmental impairment of any kind whatsoever including but not limited to pollution of any water, land, or air; arising from or in any way related to asbestos and or asbestos containing materials; or arising from or in any way related to exposure over time to any alleged toxic, harmful or defective material, device, substance, agent, or activity including but not limited to chemicals, drugs, petroleum based products, pharmaceutical products, noise, radiation, electromagnetic fields or repetitive motion.

## PART B. - CLAIMS ADJUSTING SERVICES (REPORTED)

### BILLING NUMBER 4314

ESIS and the Client hereby agree that ESIS will provide Claims Adjusting Services to the Client according to the following terms and conditions:

1. **CLAIMS ADJUSTING SERVICES - EFFECTIVE DATES; RENEWALS:** This PART shall be effective with respect to Claims (as defined herein) reported during the period beginning 12:00 a.m. on the April 01, 2000 and ending at 11:59 p.m. on March 31, 2001. However, upon the expiration of this PART and any renewal period or periods, ESIS shall continue to perform its obligations hereunder, on the terms set forth in SECTION III and any Addendum hereto, with respect to Claims reported during the term of this PART, until all Claims under this contract have been paid or settled, all applicable statutes of limitations have run, and there is no further possibility that any additional Claims may arise.

2. **CLAIMS ADJUSTING SERVICES - DEFINITIONS:**

   a. **Allocated Loss Expenses** shall mean any cost or expense ESIS incurs on the Client's behalf as a result of ESIS' engaging the service of firms or persons outside ESIS' organization for work in connection with the investigation, adjustment, settlement, or defense of a Claim. Allocated Loss Expenses include, but is not limited to the following: subrogation; automobile or other physical damage appraisal; all court costs, fees, and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of depositions and court reporters or recorded statements. Allocated Loss Expenses are not included in Claim Transaction Fees.

   b. **Claim or Claims** shall mean each monetary demand against the Client based upon each itemized loss or damage occurring in the United States or Canada (or in such other locations as may be agreed upon by the parties and specified in an Addendum to this PART), resulting from physical injury to or destruction of tangible property, loss of the use of tangible property, bodily injury, sickness, or disease (including death resulting therefrom) if the demand:

      1) is reported during the term of this PART, and;

      2) is reported to ESIS by the Client on a timely basis, and;

      3) is a Claim of the type described in SECTION III, but not excluded by SECTION II, B2.6.b.

   c. **Claim Fund** shall mean the funds which the Client makes available to ESIS for use in paying Allocated Loss Expenses and Claim payments, but excluding Special Billed items, on the Client's behalf. Claim payments in excess of this threshold shall be paid in accordance with the provisions of SECTION II, B2.4.f. hereof.

d.   **Claim Transaction Fee** means the amount of compensation owed by the Client to ESIS in accordance with SECTION III of this Agreement.

e.   **Late Reported Claims** shall mean Claims which are within the definition of Claim and which are reported to ESIS after the cancellation or expiration of this PART and any renewals hereof.

f.   **Discretionary Settlement Authority Limit** shall mean the maximum amount of money which the Client is authorizing ESIS to spend without obtaining prior approval from the Client in order to settle any one Claim. Allocated Loss Expenses are not subject to nor included in the Discretionary Settlement Authority Limit. **The Discretionary Settlement Authority Limit shall be established initially in the amount of $5,000 for Worker's Compensation type claims**, and may be increased or decreased by the Client; provided, however, that in the event of any such increase or decrease, ESIS may modify the amounts of the Claim Transaction Fees.

g.   **Occurrence** means an event or series of events deemed by the Client to give rise to one or more Claims. It may include events which are either causative in nature, or the result of some cause or causes (such as the onset of disease, injury, or damage), or both. It is not intended to be the equivalent of any commonly used definition of the term as found in policies of insurance.

h.   **Special Billed Amounts** – The amount to be paid by ESIS in respect to any single Claim payment that exceeds $50,000.00 shall be specially billed to the Client and monies paid to ESIS before the check shall be issued by ESIS.

3.   **CLAIMS ADJUSTING SERVICES - OBLIGATIONS OF ESIS** - ESIS' obligations under this PART are to:

a.   Investigate, adjust, and otherwise administer Claims, including the arrangement of a defense for litigated Claims, as ESIS deems necessary in accordance with ESIS' best professional judgment as a claims adjuster and state laws and regulations permit for monopolistic states. The Client agrees that ESIS may meet its obligations by engaging, at its reasonable discretion and on the Client's behalf, the services of persons or firms outside of ESIS' organizations.

b.   Review the facts of each Claim and the law applicable thereto to determine what compensation, if any, should be paid on the Client's behalf for each Claim. ESIS shall obtain the Client's prior approval before offering to settle any Claim for an amount which exceeds the amount of ESIS' Discretionary Settlement Authority Limit, and ESIS shall incur no liability in excess of the Discretionary Settlement Authority Limit as a result of its failure to settle any Claim for an amount within the Discretionary Settlement Authority Limit.

c.   Determine what Allocated Loss Expenses shall be incurred in the investigation, adjustment, administration, and defense of each Claim.

d.   Make payments for settlement of Claims and for Allocated Loss Expenses out of funds provided by the Client to ESIS. However, ESIS shall have no responsibility to determine or notify the Client of exhaustion of the Client's deductible aggregate as defined in any policy of insurance.

e.   Maintain a file on reported Claims. All Claim files will be the Client's property and will be available for inspection by the Client upon reasonable notice to ESIS. The Client may conduct, at no additional charge, one formal file review annually at a mutually agreed upon central location to review a representative number of Claim files. ESIS reserves the right to charge time and expenses involved in formal reviews beyond this standard allowance.

f.   Dispose of Claim files in accordance with the Client's directions or, in the absence of such directions, at ESIS' discretion as permitted by applicable state and federal laws.

g.  Provide statistical or loss experience reports to the Client concerning the status of (a) Claims, (b) Claim reserves, and (c) Claim payments as agreed upon by ESIS and the Client in writing from time to time.

h.  Maintain confidentiality with respect to the contents of the Client's files such that the contents thereof are not disclosed to third parties, except as shall be required for ESIS to carry out its obligations under this PART or to comply with requirements imposed by applicable laws or regulations.

i.  Administer all Claims reported to their conclusion.

4.  **CLAIMS ADJUSTING SERVICES - OBLIGATIONS OF THE CLIENT** - The Client's obligations under this PART shall be to:

a.  Refer promptly to ESIS each Claim which falls within the scope of this PART after the Client has received notice of such Claim.

b.  Pay to ESIS immediately upon execution of this PART the amount necessary to establish the Claim Fund, and maintain the appropriate balance for the duration of this PART.

c.  Pay to ESIS all Claim Transaction Fees and Claim Fund invoices according to the provisions of this PART. If the Client fails to pay such amounts according to the terms of this PART, ESIS shall have the right to claim a retaining lien on the Client's Claim files in ESIS' exclusive possession until all Claim Transaction Fees and Claim Fund invoices due are paid. This subsection shall survive the expiration or cancellation of this PART until all Claims are closed or some mutual agreement is reached by ESIS and the Client.

d.  Continue to remit sufficient monies to ESIS, upon presentation of an appropriate invoice, to allow ESIS to maintain the Claim Fund at all times at an amount sufficient to enable ESIS to pay Claims and Allocated Loss Expense payments as required by this PART. The Client agrees that "sufficient monies" as used in this paragraph shall be a sum equal to the sum of

1)  all Claim payments and Allocated Loss Expenses, but excluding Special Billed amounts, paid by ESIS during the preceding ten (10) weeks; or

2)  any other amount as may be mutually agreed upon by the Client and ESIS.

e.  ESIS may require the Client to increase the amount of the Claim Fund if the amount of the Claim Fund is insufficient in ESIS' estimation to pay Claims or Allocated Loss Expenses because of unusual circumstances beyond the scope of the standard formula. Moreover, if the Client does not reimburse the Claim Fund on a timely basis following ESIS' mailing of an invoice to the Client, ESIS may immediately require the Client to increase the Claim Fund to a level greater than the amount paid on the Client's behalf for Claim payments and Allocated Loss Expenses during the previous ten (10) week period. If the Client fails to make funds available to ESIS within ten (10) days after receipt of a Claim Fund invoice for payment of Claims and Allocated Loss Expenses in the amount required hereunder, ESIS may suspend its obligation to make such payments and all other Claims services provided by ESIS under this PART until ESIS shall receive funds from the Client for this purpose. The Client agrees that it will indemnify ESIS and hold it harmless for the full amount of any and all liability, fees, fines, assessments, judgments, or penalties resulting from an interruption or cessation of ESIS' Claims services which ESIS caused by reason of the Client's failure to reimburse the Claim Fund to the level required under paragraph D above, or to provide any additional monies for the Claim Fund which ESIS in its discretion may have requested pursuant to this paragraph.

f.  Notwithstanding the other provisions of this PART, in the event that the amount to be paid by ESIS in respect of any single Claim payment shall exceed the Special Bill Amount  upon receipt of ESIS' invoice for this special billed amount, immediately remit to ESIS the full amount of such payment as stated on the invoice.  ESIS shall have no obligation to make such payment unless and until ESIS has received payment of this special billed amount from the Client.

## 5.  CLAIMS ADJUSTING SERVICES - GENERAL PROVISIONS:

a.  ESIS shall have full authority and control in all matters pertaining to the investigation, adjustment, and administration of Claims covered by this PART, subject to any limitations which ESIS and the Client may have agreed upon as set forth in this agreement or in any Addendum to this PART agreed to and duly executed by both parties hereto.

b.  When and as necessary in ESIS' judgment, ESIS shall have the right to communicate directly with the insurance carrier which is providing coverage to the Client in excess of the amount of the Client's deductible or self-insured retention.  ESIS may provide information to any such insurance carrier, including data which relates to any open or closed Claim or loss, regardless of whether such Claim is likely to result in liability to that insurance carrier.  When directed by the Client to a specific policy, ESIS shall give notice to the designated ACE insurance company of the existence of an individual Claim.  As between ESIS and the Client, the Client shall have the sole responsibility to determine whether and when Claims handled on the Client's behalf and Allocated Loss Expenses incurred on the Client's behalf under this PART equal or exceed, or are likely to equal or exceed, any specific limit or any aggregate limitation applicable to the Client's coverage or deductible/self-insured retention under the terms of the Client's insurance policy or policies.

c.  In the case of any Claim in which the date of the Occurrence or any element thereof is not known or could be disputed factually or legally but which is otherwise within the scope of this PART, ESIS will accept the date or dates assigned by the Client.  It is agreed that such acceptance is not an express or implied agreement by ESIS or its agents or employees that the selection of the date or dates of Occurrence is correct in fact or as a matter of law.  If the Client and ESIS have, at any time, entered into more than one Claim Service Agreement covering different time periods, acceptance by ESIS of the Client's designated date of Occurrence is not an express or implied agreement that the Client's allocation among its contracts is correct in fact or law.  No action of ESIS or its agents or employees shall be construed as an admission or opinion on any issue of fact or law or date or dates of events which may be relevant to the obligations of any insurance company, including the concept of occurrence as used in policies of insurance.

d.  It is understood that ESIS is affiliated with certain insurance company affiliates of the ACE Companies.  Since the Client may or may not consider its Claims referred to ESIS as relevant to an insurance program with one or more of these companies, the Client must identify each Claim individually to a specific policy if the Client believes the Claim to be covered.  ESIS claims adjusters will have no affirmative duty to participate in determination of coverage under any insurance policy.

## 6.  CLAIMS ADJUSTING SERVICES - FEES:

a.  ESIS shall impose a Claim Transaction Fee charge for each Claim reported by the Client to ESIS.  For occurrences which generate more than five Claims, ESIS' Claim Transaction Fee will be fifty percent (50%) of the stated fee for each Claim reported after the first five such Claims.  If more than twenty-five Claims result from any one occurrence, ESIS' fee will be the standard charge for the first five Claims and fifty percent (50%) of the standard fee charge for the next twenty Claims, and all additional Claims arising from such occurrence shall be calculated on the basis of time spent and expenses incurred by ESIS with respect to them at a rate that shall be agreed upon in writing.

    b.   General Liability Claims Transactions Fees as set forth herein shall not be applicable to Claims arising from or related to pollution, toxic material, or environmental impairment of any kind whatsoever including but not limited to pollution of any water, land, or air; arising from or in any way related to asbestos and or asbestos containing materials; or arising from or in any way related to exposure over time to any alleged toxic, harmful or defective material, device, substance, agent, or activity including but not limited to chemicals, drugs, petroleum based products, pharmaceutical products, noise, radiation, electromagnetic fields or repetitive motion.

## PART C. - LOSS CONTROL SERVICES

## BILLING NUMBER 56-405

ESIS and the Client hereby agree that ESIS will provide Loss Control Services to the Client according to the following terms and conditions:

1.    **LOSS CONTROL SERVICES - EFFECTIVE DATES; RENEWALS:** This PART shall be effective during the period beginning 12:00 a.m. on **April 01, 2000** and ending at 11:59 p.m. on **March 31, 2001**, and maybe renewed for additional annual periods as the Client and ESIS shall mutually agree.

2.    **LOSS CONTROL SERVICES - DEFINITIONS:** None required.

3.    **LOSS CONTROL SERVICES - OBLIGATIONS OF ESIS:** ESIS' obligations under this PART are to:

    a.   Provide Loss Control Services at the Client's locations within the Continental United Sates, Alaska, and Hawaii. The locations receiving such Loss Control Services shall be agreed upon from time to time, together with applicable adjustments in the Service Fee.

    b.   ESIS will provide Loss Control Services which may include but are not limited to all or part of the following activities:

    1)   analysis of losses and loss trends;

    2)   performance of a survey to identify loss exposures and hazards;

    3)   interviews with key personnel regarding loss control activities and their perception of needs;

    4)   evaluation of the adequacy of existing loss control activities;

    5)   prioritization of needed hazard controls and related loss control activities;

    6)   discussion of findings and recommendations with the Client;

    7)   provision of a written report to the Client which includes recommendations;

    8)   assistance to the Client in their implementation of corrective action.

    c.   A more specific statement of activities to be performed under this PART is set forth below:

    **No Special Conditions required by Client.**

    d.   ESIS will perform no supervisory activities and will assume no obligation to make changes in the Client's operations or to implement any recommendations. Performance of Loss Control Services shall not be construed as an approval of design or function by us. The performance of Loss Control Services does not supplant any legal duty of the Client to provide a safe work place, premises, product, or operation.

4.    **LOSS CONTROL SERVICES - OBLIGATIONS OF CLIENT:**  The Client agrees to provide access to all facilities, records, and personnel required by the loss control professional in order to complete the loss control services required by this PART.

5.    **LOSS CONTROL SERVICES - GENERAL PROVISIONS:**

   a.    In the event of a termination of this PART, an immediate accounting of Service Fees shall be made and such fees shall be payable within ten (10) days of completion of the services provided hereunder.

   b.    The Client agrees to indemnify and hold ESIS harmless from any and all Claims which arise as a result of activities performed under this PART unless it is determined that a proportion of the liability was caused by ESIS' negligence. Where ESIS has been adjudged to have been negligent with respect to the provision of the Loss Control Services agreed upon under this PART, ESIS will indemnify the Client and will be responsible for its proportionate share of liability for damages. In no event will ESIS be responsible for any punitive damages awarded against the Client.

## PART D. - RISK MANAGEMENT INFORMATION SYSTEMS

### BILLING NUMBER 70842

ESIS and the Client hereby agree that ESIS will provide Risk Management Information Services (RMIS) during the period beginning 12:00 a.m. on April 01, 2000 and ending at 11:59 p.m. on March 31, 2001, of the below listed types to the Client according to the following terms and conditions; and provided through mutually agreed upon equipment and installation(s):

1.    **RMIS DEFINITIONS:**

   a.    **RISK ADVANTAGE LOSS MANAGEMENT** - RiskAdvantage Loss Management from ESIS is a state-of-the-art loss management system offering powerful, responsive, on-line access to claims, policy and legal information, and the ability to analyze loss trends and create risk management reports to support management decision making. Specific on-line capabilities include, but are not limited to, the following:

   1)   read-only inquiry against Claims data including payments, reserves, recoveries, and basic Claims data;

   2)   read-only access to the adjuster's notes;

   3)   diary/tasks message capability to and from the Claim offices (not a permanent part of the Claim file);

   4)   training on use of the system.

   Restrictions on the use of the system may occur from time to time as systems for individual lines of business are enhanced. The range of services may be either increased or decreased without notice as enhancements or modifications to the primary Claim system are effected.

   b.    **STATEMENT OF WORK (SOW)** is a special customized computer programming effort that will be undertaken by ESIS at the direction of the Client modifying the standard offerings of either CRIS® or CAF. The STATEMENT OF WORK describes in detail specific computer equipment, reports, software, communications lines, access to program libraries and data files, and/or other products and services being provided by ESIS to the Client as CRIS® ADVANCED FUNCTIONS. A description of the service to be provided is outlined in the fee section of this document. The Client agrees to use reasonable care in defining the work to be accomplished. The Client further agrees that the signed STATEMENT OF WORK agreed to

by both parties will be the reasonable technical definition of the work to be performed. If the Client's ultimate requirements necessitates significant additional work beyond the scope of what was originally agreed upon with the signed STATEMENT OF WORK, the Client agrees that additional fees, to be mutually agreed upon, may be required for the completion of the work.

## 2.   RMIS - OBLIGATIONS OF ESIS:

a.   ESIS shall provide the Client computer equipment, reports, software, communication lines, access to program libraries and data files, and/or other products and services consistent with the selected published service level for the above listed services, effective for the period of this PART. The specific equipment and services may vary from time to time because of changes in technology and capabilities, but shall be sufficient to permit the Client access to data appropriate to the level of service negotiated.

b.   All equipment, software products, and services provided by ESIS are the property of ESIS and are furnished to the Client as a client service. ESIS may revise or discontinue the levels of service upon not less than thirty (30) days advance written notice to the Client. Enhancements or corrections to service are not considered revisions and may be provided without prior notice.

c.   ESIS warrants any electronic data processing services furnished hereunder against malfunctions, errors, or loss of data which are due solely to errors on its part. If the Client notifies ESIS in writing and furnishes adequate documentation of any such malfunction, error, or loss of data, then, ESIS will, without charge, re-create the data designated by the client, using the best available technology. With respect to other data that Client caused to be entered into the specific system in question, ESIS will regenerate, without charge, any of the Client's lost data if the Client provides to ESIS adequate backup material.

d.   ESIS will provide basic insurance for all equipment provided to the Client by ESIS as part of this service. ESIS will provide maintenance for all such equipment during normal business hours, provided the Client notify ESIS promptly of all such equipment malfunctions.

e.   ESIS MAKES NO OTHER WARRANTY, EITHER EXPRESS OR IMPLIED, AND HEREBY DISCLAIMS ANY LIABILITY WITH RESPECT TO SOFTWARE, EQUIPMENT, AND DATA BASE OR SOURCE DATA, INCLUDING NOT BUT LIMITED TO, ITS ACCURACY, ADEQUACY, COMPLETENESS, USEFULNESS, OR RELIABILITY, WHICH IS MADE AVAILABLE TO THE CLIENT OR BY THE CLIENT IN CONNECTION WITH ANY RMIS PRODUCTS, EQUIPMENT, OR SERVICES COVERED BY THIS AGREEMENT.   THE CLIENT HEREBY WAIVES ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES.

## 3.   RMIS - OBLIGATIONS OF CLIENT:

a.   The Client agrees to use reasonable measures to protect the information made available to them as part of these services  The Client is responsible for utilizing all available security features and for notifying ESIS promptly for all potential and actual breaches of the security system or systems.

b.   The Client agrees that the information recorded in any of these systems will not be used as a pretext for retaliatory or other illegal or unfair discriminatory employment practices in violation of any federal or state statute or regulation.

c.   The Client agrees that regardless of the cause of any malfunction, error, or lost data, the maximum and only liability of ESIS shall be its obligation under this Agreement to reprocess reports or regenerate data as described above; and that ESIS shall have no liability whatsoever to the Client or any third party for monetary damages as a result thereof.

## 4. RMIS – GENERAL PROVISIONS:

a. It is understood and agreed that the objective of these systems is to facilitate the electronic exchange of information of the type traditionally shared by means of paper document exchange between a consumer and the provider of Claim service. Accordingly, neither party has any obligation to enter or provide access to the other with respect to information which is intended to be commentary on or otherwise relevant to an actual or potential coverage dispute or any other communication intended to be confidential, privileged, or solely internal as respects the other party.

b. The Client agrees that regardless of the cause of any malfunction, error, or lost data, the maximum and only liability of ESIS shall be its obligation under this Agreement to reprocess reports or regenerate data as described above; and that ESIS shall have no liability whatsoever to the Client or any third party for monetary damages as a result thereof.

c. Each party agrees to limit access to these systems to those persons who perform the essential functions of claim and risk management, including that each party shall protect the security access passwords to hardware and communications, except that this provision is not intended to limit either party from generating from these RMIS systems and using reports and statistics for legitimate business purposes, in which case the identities of claimants and others referenced in individual Claims shall be omitted when used outside the system, unless their inclusion is essential to a legitimate business purpose.

d. Each party agrees that, as to any other persons or organizations, information entered into and generated from these systems is confidential and proprietary, and may be privileged and/or work product protected from discovery by law and/or rules of court. Therefore, neither party will release any information unless:

1) compelled by an order of a court of competent jurisdiction;

2) mandated by an insurance code, claim practices act, workers' compensation law, or other applicable law or regulation to provide information to the claimant or other person;

3) mandated by applicable court discovery rules in the opinion of the defense counsel, if any, or the claim professional responsible for the adjustment of the Claim.

In either event, all information sought to be produced will be prescreened by ESIS in consultation with the Client, if such consultation is specifically requested by the Client. If there is an obligation to release part but not all of the information, the part deemed not responsive will be withheld, but nothing in this Agreement is intended to abrogate the duty of either party to comply in good faith with rules of court governing discovery in litigation.

e. Each party agrees that it will make reasonable efforts to:

1) enter only Claim information that is factually accurate;

2) identify as such information that is comprised of opinions, approximations or estimations, and, when practicable, identify sources;

3) prescreen all source material for references to any person's reputation, health, personal habits and conduct, lifestyle, and other matters of a private nature and decline to enter the same unless the information is necessary to a fair understanding of facts relevant to the Claim.

f.  Each party agrees that the information contained within these RMIS systems must be treated in a confidential manner by all users and each party further agrees that it will educate all of its employees, agents, or other users why may gain authorized access to the system of the need for confidentiality in using the information. Each party will be responsible for the results of any and all actions alleging breach of confidentiality by any of their respective employees, agents, or other authorized users of the information.

g.  In the event of a third party suit alleging defamation, false light, or other invasion or privacy tort, violation of civil rights, or violation of fair employment practice laws, and arising from the use of these systems and this PART, the liable party agrees to indemnify and hold harmless the other party for all sums due under the terms of a judgment or reasonable settlement, including interest and attorneys' fees, upon a final judgment or mutual agreement that one of the parties hereto is liable as charged in such allegations.

h.  Termination or expiration of the Service Agreement for any individual service listed above will be effected by ESIS removing the Client's password from the list of authorized users for that service. Not more than sixty (60) days after the date of termination or expiration of this Agreement, the Client shall return to ESIS all equipment provided hereunder.

i.  Each party agrees that it will not disclose to any third party any information concerning trade secrets, methods, procedures, or any other confidential, financial, or business information of the other party which it learns during the course of its performance of this Agreement without the prior written consent of the other party. Client acknowledges and agrees that all software used by the Client in connection with the services including, without limitation, the screens and output formats generated thereby, are strictly confidential and the property of ESIS. Client will retain exclusive rights to and ownership of all data generated by ESIS for Client pursuant to this Agreement.

# SECTION III - FEES

**PART A - DUE DATES:** All ESIS' fee invoices are payable not later than ten (10) days after the Client's receipt thereof.

**PART B - DESCRIPTION:** The amounts of ESIS' fees hereunder shall be as follows:

I.      **Claims Adjusting Services (Occurrence) Fees:**
   a. **Other Fees: Billing Contract Number 4297 4298:**

CONTRACT 4297 & 4298
Solutia, Inc. will reimburse ESIS monthly for actual service fees incurred during the previous month. The following per claim rates will apply:

Contract 4297

| | |
|---|---|
| $ 825. | Automobile Liability Bodily Injury* |
| $ 315 | Automobile Liability Property Damage |
| $ 490 | Automobile Liability PIP* |
| $ 215 | Automobile Liability Medical Payments |
| $ 2,299 | Products Liability Bodily Injury |
| $ 350 | Products Liability Bodily Injury Administrative Only |
| $ 835 | Products Liability Property Damage |
| $ 1,022 | General Liability Bodily Injury* |
| $ 540 | General Liability Property Damage |
| $ 923 | Premises Liability Bodily Injury* |
| $ 513 | Premises Liability Property Damage |

Contract 4298

| | |
|---|---|
| $ 1,084 | Self-Insured Workers' Compensation |
| $ 380 | Managed Medical Only |
| $ 106 | Medical Only |

*Under this contract, open/reopened claims will be assessed the following anniversary fees at each anniversary the claim remains open from the date reported:

| | |
|---|---|
| $ 200 | Automobile Liability Bodily Injury |
| $ 150 | Automobile Liability PIP |
| $ 300 | General Liability Bodily Injury |
| $ 250 | Premises Liability Bodily Injury |

Contract 4314
Claims will be billed at a fee per claim rate of $815 for the first year of handling by ESIS. Each subsequent annual period that claims remain open an anniversary rate of $315 per claim will be billed. A maximum of three (3) additional anniversary periods will be billed.

ADMINISTRATIVE FEE:

The ESIS Administrative Fee of $8,000 will be billed in twelve monthly installments of $666.67.

2.    Claims Adjusting Services (Reported) Fees:

a.  Other Fees: Billing Contract Number 4314:

Contract 4314

Claims will be billed at a fee per claim rate of $815 for the first year of handling by ESIS.
Each subsequent annual period that claims remain open an anniversary rate of $315 per claim will be
billed.  A maximum of three (3) additional anniversary periods will be billed.

3.  Loss Control Services Fees:

Billing Number(s) 56-405

Elevator Inspection Services to be billed as incurred at $90 per hour.

4.  Risk Management Information Systems (RMIS) Fees:

Billing Number(s):  70842

ESIS will bill the following annual RMIS charges of $53,225 in twelve monthly
installments:

| Data Maintenance and Storage: | | $17,815 |
|---|---|---|
| RiskAdvantage: | | $22,550 |
| CRIS Advance Functions: | | $11,860 |
| Graphs | | |
| Duplication | $2,160 | |
| Administration | $5,000 | |
| Shipping | $ 200 | |
| ASC Consulting | $4,500 | |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on their behalf by the undersigned duly authorized persons.

Solutia, Inc.                                        ESIS

_____                    _____
Signature                                          Signature

David P. Jones                                     Donald J. Shiplet
Printed Name                                       Printed Name

Senior Risk Management Analyst                     General Manager/Vice President
Printed Title                                      Printed Title

_____                    _____
Date                                               Date

# ADDENDUM #1 to ESIS SERVICE AGREEMENT

# RENEWAL OF ESIS SERVICE AGREEMENT

### ACCOUNT NAME: Solutia, Inc.

This Addendum is effective during the period beginning 12:00 a.m. on **April 01, 2001** and ending at 11:59 p.m. on **May 31, 2001,** by and between ESIS ("ESIS"), a California Corporation with an office at **525 W. Monroe St., Chicago, IL 60661,** and Solutia, Inc. (the "Client") with offices at **Maryville Centre Drive, St. Louis, MO 63166,**and it shall extend the original contract between these parties for the period April 01, 2000 through March 31, 2001, a copy of which is attached.

## 1. <u>Terms and Conditions</u> - All Terms and Conditions remain the same with the following noted exceptions:

**Administrative Fee:**

No Administrative Fee will be charged for this period.

**Risk Management Information Systems (RMIS) Fees:**

**Billing Number(s): 70842**

ESIS will bill the following RMIS charges for the period 04/01/01 through 05/31/01:

| | |
|---|---|
| Data Maintenance and Storage:<br>($17,815 / 12 ) x 2 months | $2,969 |
| RiskAdvantage:<br>(2 Level IV ID's ($12,500 + $4,800) / 12) x 2 months | $2,883 |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on their behalf by the undersigned duly authorized persons.

**Solutia, Inc.**                                    **ESIS**

_____                    _____
Signature                                          Signature

David P. Jones                                     Donald J. Shiplet
Printed Name                                       Printed Name

Senior Risk Management Analyst                     General Manager/Vice President
Printed Title                                      Printed Title

_____                    _____
Date                                               Date

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS
OFFICE OF THE JUDGE OF COMPENSATION CLAIMS

Fannie Ranaldson
  Employee/Claimant,

vs.

Solutia and Broadspire
  Employer/Carrier,

)
)
)
)
)
)  OJCC Case No. 05009021DWL and 05009023DWL
)
)  Judge: David Langham
)

**FINAL ORDER DENYING COMPENSABILITY OF ALLEGED ACCIDENT OF SEPTEMBER 2, 2003, DENYING SOME PERIODS OF PERMANENT TOTAL DISABILITY BENEFITS AND GRANTING OTHER PERIODS OF PERMANENT TOTAL DISABILITY BENEFITS, PENALTIES, INTEREST, COSTS AND ATTORNEYS FEES**

THIS CAUSE was heard before the undersigned at Pensacola, Escambia County, Florida on September 19, 2005 upon the Claimant's claims for compensability of 9/2/03 injuries, permanent total disability benefits from 9/3/03 to present and continuing, 5% supplemental benefits, authorization of a primary care doctor to treat for 9/2/03 D/A, authorization of prescriptions written by Dr. Vernali, and penalties, interest, costs, and attorney's fees. The petitions for benefits were filed March 18, 2005. Mediation occurred on June 28, 2005 (102 days after the petition was filed), and the parties' pretrial compliance questionnaire was filed August 18, 2005. The final hearing occurred one hundred eighty-five (185) days after the petition was filed. John Wesley, Esq. was present in Pensacola on behalf of the Claimant. Thomas Condon, Esq. was present in Pensacola on behalf of the Employer/Carrier (hereafter "E/C").

Submitted into evidence at the Final Hearing were the following documents, each accepted and placed into evidence without any objection except where noted, as joint exhibits, Claimant's exhibits, or E/C exhibits, with each individual exhibit being further identified by a numerical designation as follows:

Fannie Ranaldson v. Solutia and Broadspire
Final Order      OJCC Case No. 05009021DWL
           OJCC Case No. 05009023DWL

Page 1 of 21
October 10, 2005

Exhibit 2

**JUDGE'S EXHIBITS MARKED FOR THE RECORD:**

1. The parties pre-trial compliance questionnaire filed August 18, 2005 was marked as Judge's exhibit "1" for the record.

2. A correspondence filed by the Employer/Carrier on September 21, 2005 was marked as Judge's exhibit "2" for the record.[1]

**JOINT EXHIBITS:**

1. The deposition of Salvadore Vernali, M.D. taken August 9, 2005 was marked as Joint exhibit "1" and accepted as evidence.

2. The deposition of James Fay, M.D. taken August 25, 2005 was marked as Joint exhibit "2" and accepted as evidence.

3. The deposition of James Fay, M.D. taken September 9, 2005 was marked as Joint exhibit "3" and accepted as evidence.

4. The Claimant's file from the Social Security Administration was marked as Joint exhibit "4" and accepted as evidence.

5. A payment ledger regarding the March 29, 2001 date of accident was marked as Joint exhibit "5" and accepted as evidence.

**CLAIMANT'S EXHIBITS:**

1. The deposition of Richard Gilmartin taken September 8, 2005 was marked as Claimant's exhibit "1" and accepted as evidence.

**EMPLOYER/CARRIER EXHIBITS:**

1. None.

---

[1] This document may have been intended by the E/C as a closing argument or supplemental authority. No pleading or argument was submitted, however, but merely a letter. The legal significance or efficacy of a letter is at best doubtful. Despite being submitted in such an informal format, the document and its attachments were marked for the record and the case law submitted has been considered in reaching the conclusions herein.

---

Fannie Ranaldson v. Solutia and Broadspire
Final Order      OJCC Case No. 05009021DWL
OJCC Case No. 05009023DWL

Page 2 of 21
October 10, 2005

In making the determinations set forth below, I have attempted to distill the salient facts together with the findings and conclusions necessary to resolve this claim. I have not attempted to painstakingly summarize the substance of the parties' arguments, nor the support given to my conclusions by the various documents submitted and accepted into evidence; nor have I attempted to state nonessential facts. Because I have not done so does not mean that I have failed to consider all of the evidence. In making my findings of fact and conclusions of law in this claim, I have carefully considered and weighed all evidence submitted to me. I have considered arguments of counsel for the respective parties, and analyzed statutory and decisional law of Florida.

Based upon the parties' stipulations and the evidence and testimony presented, I find:

1.    The Judge of Compensation Claims has jurisdiction of the parties and the subject matter of this claim.

2.    The parties' stipulations and agreements, set forth in the pretrial compliance questionnaire are accepted, adopted and made an order of the Office of the Judge of Compensation Claims.

3.    Any and all issues raised by way of the Petitions for Benefits ("PFB"), but which issues were not dismissed or tried at the hearing, are presumed resolved, or in the alternative, deemed abandoned by the Claimant and, therefore, are Denied and Dismissed with prejudice. See, Betancourt v. Sears Roebuck & Co., 693 So.2d 680 (Fla. 1st DCA 1997); see also, McLymont v. A Temporary Solution, 738 So.2d 447 (Fla. 1st DCA 1999).

4.    The Florida Evidence Code controls admissibility of evidence in workers' compensation proceedings.[2] The procedural aspects of this claim are governed by the Division of

---

[2]    See, Martin Marietta Corp. v. Roop, 566 So.2d 40 (Fla. 1st DCA 1990); Odom v. Wekiva Concrete Products, 443 So.2d 331 (Fla. 1st DCA 1983).

Administrative Hearings ("DOAH") Rules of Procedure, Section 60Q6.101, et. seq. Florida Administrative Code.[3] Those Rules are referred to herein as "DOAHRP."

5.    Salvadore Vernali is a medical doctor Board Certified in internal medicine. He testified that Claimant came under his care on September 5, 2002. He understood that the purpose of his examination was to evaluate "for dyspnea (shortness of breath) to see how much the asbestosis contribution was·to her dyspnea." He testified that Claimant reported she had been diagnosed with asbestosis, was taking Combivent, Wellbutrin, and Primarin. He performed an examination and noted decreased breath sounds, no wheezing, no rales, and no rhonchi. He reviewed a CT scan and diagnosed "asbestosis by CT scan of the chest," which demonstrated "pulmonary fibrosis." Dr. Vernali testified that the CT scan did not demonstrate "plaques" and showed "very minimal" asbestosis. He testified that asbestosis.is "graded" from "one" to "four" and that Claimant's disease process is "Grade One." He testified that he also diagnosed COPD. After making his diagnosis, he ordered a pulmonary function test ("PFT") to evaluate complaints of shortness of breath ("SOB"), also called "dyspnea." He opined that the PFT was consistent with both obstructive (COPD) and restrictive (asbestosis) lung disease. He opined that Claimant's work is the major contributing cause[4] of her asbestosis/fibrosis, "by the history given."[5] Dr. Vernali noted Claimant's long history of cigarette smoking, and opined that Claimant's COPD was caused by cigarette smoking and is unrelated "to the asbestosis." He opined however, that the shortness of breath "could be associated with either one, asbestosis of COPD." After his

---

[3]    On February 23, 2003, the OJCC enacted procedural rules, designated 60Q-6.101, et seq. The enactment was recognized by the Florida Supreme Court in repealing the former Florida Rules of Workers' Compensation Procedure. In Re Florida Rules of Workers' Compensation Procedure 891 So.2d 474 (Fla. 2004).

[4]    The determination of major contributing cause is a legal determination upon which expert medical evidence may be persuasive. Closet Maid v. Sykes, 763 So.2d 377 (Fla. 1st DCA 2000).

[5]    On this basis, Dr. Vernali's diagnosis does not appear to be predicated upon "objective medical evidence," see Fla. Stat. §440.09(1). However, the Employer/Carrier has agreed that Claimant's asbestosis is a compensable condition. That agreement is legally afforded great deference. See, Citrus World Inc. v. Mullins, 704 So.2d 128 (Fla. 1st DCA 1997). Therefore, the issue of the compensability of the asbestosis condition is not before me. (See also footnote 17).

Fannie Ranaldson v. Solutia and Broadspire                        Page 4 of 21
Final Order           OJCC Case No. 05009021DWL        October 10, 2005
                     OJCC Case No. 05009023DWL

examination, he concluded that Claimant's shortness of breath is "predominantly" caused by the COPD,[6] but she has "some dyspnea associated with the asbestosis."[7]

6.  Dr. Vernali opined that the asbestosis diagnosis could progress. In some patients this could take in excess of twenty (20) years, in other patients it progresses more quickly. He testified that it "may never interfere with the patient's life cycle," or it is possible Claimant would eventually become oxygen dependent or wheelchair dependent due to the shortness of breath. Dr. Vernalli opined that Claimant's asbestosis condition has not progressed significantly during the course of her care with him. He opined that COPD is also progressive, and that it progresses "much quicker" than asbestosis. Dr. Vernali opined that Claimant's COPD has progressed during the time he has provided care and treatment. He testified that he prescribed a nebulizer "that would help for the COPD." This machine dispenses a bronchodilator medication which opens up the airways so more air can enter and also facilitates "to get the air out of your lungs." He testified that the treatment for the asbestosis may eventually be steroids and oxygen, but that Claimant does not need those at this time.[8] He diagnosed "pulmonary fibrosis, and two, COPD exacerbation." He opined that the nebulizer is "solely used to treat the COPD." He testified that there is no treatment for asbestosis until it reaches a stage where steroids and/or oxygen are required. In December 2002, Dr. Vernali corresponded "to whom it may concern" and opined that Claimant was under care for COPD and pulmonary fibrosis. His correspondence also documents that "any work restrictions" are related to the COPD and not to asbestosis. Dr. Vernali testified that in January 2003 Claimant complained of increased SOB that he believed was caused by "COPD or pulmonary fibrosis." As of January 2003, Dr. Vernali opined Claimant

---

[6]   He testified that "people with COPD can breathe in, but they can't breathe out."
[7]   He testified that "people with asbestosis . . . can't breathe in, but they can breathe out."
[8]   The E/C questioned Dr. Vernalli as to how it could discern from his billing whether care being billed for was related to COPD or asbestosis. Dr. Vernali testified that there is no treatment for asbestosis, and so presumably the Employer would know that any treatment rendered is for COPD. See also, Florida Power Corp. v. Brown, 863 So.2d 364 (Fla. 1st DCA 2003).

was restricted from use of power tools and driving. At that time he prescribed Combivent, a bronchodilator intended to relieve the SOB complaints. Claimant returned in early February 2003 with complaints of anxiety. Dr. Vernali opined that SOB "could be associated with or be exacerbated with anxiety" and so he prescribed Ativan for Claimant's anxiety. On February 27, 2003 he opined she should not work in a hot or dusty environment, and was restricted to light/medium work. In March 2003 Dr. Vernali prescribed Proventil, another bronchodilator, a liquid medication that is "aerosolized" by the nebulizer. In May 2003 Claimant reported that she had continued SOB and was awakened at night by coughing. Dr. Vernali opined that the cough "can be associated with . . . COPD and asbestosis." Dr. Vernali wrote a prescription note opining that Claimant was unable to work "due to her respiratory problems." He opined that her restriction from work result from both the asbestosis and the COPD. He testified that he could not determine with any degree of medical certainty whether her shortness of breath at that time was related to the COPD, the asbestosis, or both. On September 5, 2003 Claimant returned complaining of chest and abdominal pain. Dr. Vernali did not memorialize any event or accident that Claimant reported as a cause of those pains. He testified that if Claimant had reported any event or accident, he would have recorded that in his office note. At that time, Dr. Vernali released Claimant to return to work "light duty," specifically restricted from overhead work, operating heavy equipment/power tools, environmental exposures, bending, twisting, lifting, pulling, or pushing.[9] He testified that "light duty" to him would consist of "shuffling papers, sitting, not moving much." Dr. Vernali opined that these work restrictions would be the same even if Claimant did not have asbestosis, but was impaired solely by the COPD. Dr. Vernali testified that Claimant returned on September 11, 2003 with complaints of "deep chest pain." Dr. Vernali did not document Claimant expressing any history for that onset of pain. He testified that

---

[9]     Dr. Vernali testified that the restrictions assigned in September 2003 were the last restrictions
        assigned. He also acknowledged that he signed a form in April 2004 stating that Claimant was
        unable to work "indefinitely" at that time.

chest pain may or may not be associated with asbestosis, and the associated difficulty with inhalation. He explained that the pain could likewise be associated with the inflammation associated with COPD. Dr. Vernali diagnosed chest pain and prescribed medication to suppress cough and provide pain relief. He opined that chest pain associated with pleurisy has no relationship to physical activity, but is associated only with inhalation. Dr. Vernali testified that he thereafter prescribed Lortab for Claimant's chest wall complaints, and that this medication also addressed low back complaints that Claimant made. In January or February 2004, Dr. Vernali completed a questionnaire from Intracorp. Therein he opined that Claimant's chronic respiratory complaints are related to her COPD and not to her asbestosis. This questionnaire also contains his opinions that COPD is not work related, that any restriction on working in dusty environments is related to that COPD, and that future care for the asbestosis diagnosis would be "of a surveillance nature." He opined that only five percent (5%) to ten percent (10%) of Claimant's disability is related to her asbestosis condition.

7.   James Fay is a medical doctor Board Certified in internal medicine, pulmonary medicine and critical care medicine. Dr. Fay testified that a clinical diagnosis of asbestosis would require: (1) a reliable history of asbestos exposure, (2) symptoms of shortness of breath, (3) x-ray findings of increased reticular and nodular markings predominantly in the bases of the lungs, (4) physical findings of "velcro rales in the bases of their lung examination," often clubbing of the digits, and (5) pulmonary function studies demonstrating a restrictive pulmonary impairment with a loss of total lung capacity. Dr. Fay testified that Dr. Weaver, an industrial medicine consulting physician with the Employer, referred Claimant to him for evaluation. He testified that he performed an evaluation of Claimant in January 2003 for the purpose of determining Claimant's state of health and whether she was totally and permanently disabled. Claimant reported a long history of smoking cigarettes. She reported the onset of symptoms in 1997 including cough, shortness of breath and wheezing. Dr. Fay testified that he did not observe Claimant to be short

of breath (he agreed that shortness of breath is referred to as "dyspnea"). Dr. Fay opined that Claimant's "symptoms were not compatible to any objective evidence of" disability related to the asbestosis condition. He opined that Claimant's chest and cardiac examination were "completely normal." He testified that he listened to Claimant's breathing with an amplified stethoscope and she had no abnormal sounds or "any physical findings of either emphysema, chronic obstructive lung disease or asbestosis." Dr. Fay also interpreted a pulmonary function study as demonstrating no restrictive lung impairment, but demonstrating a "mild obstructive impairment" related to her smoking history. He testified that the results of Claimant's pulmonary function studies were of questionable validity "due to poor effort and poor cooperation." He opined that a CT scan obtained in May 2002 is not consistent with the diagnosis of asbestosis. He opined that Claimant had some degree of chronic obstructive pulmonary disease due to smoking, but that she is "not permanently totally disabled from her lung standpoint." In spite of the absence of objective findings, Dr. Fay opined that Claimant "had mild asbestosis." He opined that Claimant is able to perform her work with the Employer. He opined that she should be restricted from further exposure to asbestos, and from "heavy physical exertion, for instance, hours of climbing, hours of reaching and lifting, hours of physical labor." He opined that Claimant likely could not perform "most heavy exertion" in excess of fifteen (15) minutes. His testimony supports that he believes Claimant could not perform heavy labor, but could work above the "light" category.

8.    Claimant was accepted as totally disabled by the Social Security Administration ("SSA"). A Disability Determination and Transmittal Form signed June 9, 2005 reflects that the "primary diagnosis" for this determination was "pulmonary fibrosis," and the "secondary diagnosis" was "affective disorder." The documentation submitted in evidence with the SSA determination includes records of Dr. Turnage (knee), Dr. Sarkhoche (cardiac), Dr. Vemali, Dr. Dohn (major depression and panic disorder), Dr. Hasson (pulmonary evaluation), Dr. Roman (pulmonary evaluation), and Dr. Oaks (pulmonary evaluation). Dr. Fay is mentioned in the documents,

primarily regarding records that were transmitted to Dr. Fay. However the SSA apparently did

not have the opportunity to consider Dr. Fay's report in making its decision.

9.    Claimant bears the burden of proving she is entitled to permanent total disability benefits. As

explained below, the evidence upon which this claim for permanent total disability turns is

vocational and medical. In order to be entitled to permanent total disability, Fla. Stat.

§440.15(1)(2001),[10] pursuant to the workers' compensation law in effect on either March 29, 2001

or September 2, 2003, Claimant must have suffered a "catastrophic injury" as that term is defined

in Fla. Stat. §440.02(37).[11] Claimant therefore bears the burden of proving that her injury/injuries

satisfies one of the definitions of "catastrophic." The issue becomes narrower after analyzing the

definition of catastrophic (see footnote 11). I have concluded that Claimant has not satisfied her

burden of proving that she is "catastrophically" injured by the definitions in Fla. Stat.

§440.02(37)(a) through (e). The analysis therefore is focused on whether she has proven

"catastrophic" pursuant to Fla. Stat. §440.02(37)(f). See, Florida Distillers v. Rudd, 751 So.2d

---

[10]   Fla. Stat. §440.15(1)(b)(2001): "Only a catastrophic injury as defined in s. 440.02 shall, in the absence of conclusive proof of a substantial earning capacity, constitute permanent total disability. Only claimants with catastrophic injuries are eligible for permanent total benefits. *In no other case may permanent total disability be awarded.*" (emphasis added).

[11]   Fla. Stat. §440.02(34) provides: "'Catastrophic injury' means a permanent impairment constituted by:
(a)  Spinal cord injury involving severe paralysis of an arm, a leg, or the trunk;
(b)  Amputation of an arm, a hand, a foot, or a leg involving the effective loss of use of that appendage;
(c)  Severe brain or closed-head injury as evidenced by;
    1.   Severe sensory or motor disturbances;
    2.   Severe communication disturbances;
    3.   Severe complex integrated disturbances of cerebral function;
    4.   Severe episodic neurological disorders; or
    5.   Other severe brain and closed-head injury conditions at least as severe in nature as any condition provided in subparagraphs 1.4.;
(d)  Second-degree or third-degree burns of 25 percent or more of the total body surface or third-degree burns of 5 percent or more to the face and hands;
(e)  Total or industrial blindness; or
(f)  Any other injury that would otherwise qualify under this chapter of a nature and severity that would qualify an employee to receive disability income benefits under Title II or supplemental security income benefits under Title XVI of the federal Social Security Act as the Social Security Act existed on July 1, 1992, without regard to any time limitations provided under that act.

---

754, 756 (Fla. 1st DCA 2000); Alachua County Adult Detention Ctr. v. Alford, 727 So.2d 388,

391 (Fla. 1st DCA 1999).

> Fla. Stat. §440.02(37)(f) provides: "Any other injury that would otherwise qualify under this chapter of a nature and severity that would qualify an employee to receive disability income benefits under Title II or supplemental security income benefits under Title XVI of the federal Social Security Act as the Social Security Act existed on July 1, 1992, without regard to any time limitations provided under that act.

Determination of entitlement to social security disability benefits employs a five-step[12] test. See,

20 C.F.R. §.404.1520; Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995); Walgreen Co. v.

Carver, 770 So.2d 172 (Fla. 1st DCA 2000). It is on this point that the determination of PTD

entitlement turns in this case, and therefore the vocational and medical testimony is persuasive in

this case.

10.    Richard Gilmartin is an expert in vocational rehabilitation.[13]  Mr. Gilmartin testified that he is

knowledgeable about the five-step process employed by the Social Security Administration

("SSA"). Mr. Gilmartin performed a vocational evaluation of Claimant. This included meeting

with Claimant to obtain a history regarding her age, education and work history. He also

reviewed medical records including records from Dr. Vernali, Dr. Roman and Dr. Dohn. Mr.

Gilmartin did not review the deposition testimony of Dr. Vernali or Dr. Fay. From this analysis,

Mr. Gilmartin identified Claimant's vocational strengths and weaknesses. He identified

Claimant's completion of high school, valid Florida drivers' license, and long-term employment

with the Employer as strengths. He identified the medical restrictions imposed by Dr. Vernali,[14]

non-exertional limitations from psychiatric impairment, her age (50 years old), the time since

---

[12]    "1. Is the individual performing substantial gainful activity; 2. Does she have a severe impairment; 3. Does she have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4. Can she perform her past relevant work; 5. Based on her age, education, and work experience, can she perform other work of the sort found in the national economy"

[13]    Mr. Gilmartin's status as an expert in the field of vocational rehabilitation was not challenged. Therefore, I have accepted him as an expert, but his qualifications and credentials are not discussed further herein.

[14]    Mr. Gilmartin did not attempt to differentiate between limitations imposed relative to the fibrosis/asbestosis diagnosis and the COPD diagnosis.

Claimant last worked, and her use of a cane and breathing machine as vocational weaknesses. Mr. Gilmartin analyzed the social security five-step sequential process using the vocational, educational, and medical information he had obtained. He opined that Claimant would be classified as a person "approaching advanced age," and that her past work would be classified in terms of exertion required as "medium" and would be classified as "skilled" work. Mr. Gilmartin opined that Claimant would meet step one (1) of the process, which questions whether a social security applicant is engaged in substantial gainful activity. He opined that the medical records substantiate the existence of a "severe medical impairment," and so Claimant would meet the requirements of step two (2). Mr. Gilmartin explained that step three (3) of the five-step process questions the existence of an impairment that meets or exceeds "a listing of impairments." He opined that there is not sufficient evidence to determine "that a listing was or was not met." He testified that because there was insufficient detail to determine if a listing was met at step three (3), he proceeded to step four (4). Mr. Gilmartin testified that the fourth (4th) step in the social security process is the "application of the medical vocational guidelines," referred to as "the grids." He opined that using Dr. Vernali's assigned restrictions/limitations, Claimant would be determined "disabled" under social security Rule 201.14. He opined that this (step four) determination of presumptively disabled would terminate the SSA process with a finding of "disabled." He testified that he completed an analysis of step five (5) for the sake of completeness. He testified that in step five (5) non-exertional limitations are considered and full weight is given to the applicant's "self-reported limitations." Mr. Gilmartin opined that Claimant would be found disabled at step five (5) of the process, if the analysis reached that stage. Mr. Gilmartin testified that if Claimant had no restrictions/limitations related to her pulmonary condition, she would nonetheless be found "disabled" by SSA based solely upon the non-exertional restrictions/limitations imposed by Dr. Dohn.

Fannie Ranaldson v. Solutia and Broadspire
Final Order        OJCC Case No. 05009021DWL
OJCC Case No. 05009023DWL

Page 11 of 21
October 10, 2005

11.    Claimant asserts that this case is controlled by the restrictions/limitations imposed by Dr. Vernali.

The Employer/Carrier argues, and Claimant basically concedes, that the restrictions/limitations

imposed by Dr. Vernali are the result of her COPD diagnosis and long history of tobacco abuse.

The Employer/Carrier does not dispute the testimony of Mr. Gilmartin, and presented no

vocational evidence to contradict his conclusions and opinions. The Employer/Carrier argues that

because Claimant's pulmonary restrictions/limitations are the result of a non-compensable

condition (COPD), she may be permanently and totally disabled, but not due to the compensable

occupational disease (asbestosis). The E/C therefore alternatively argues that PTD should be

denied, and if granted it should be apportioned according to Dr. Vernali's opinions. Claimant

argues that both the asbestosis and the COPD are compensable conditions because the E/C is

precluded from denying the compensability of the COPD condition based upon the 120 day rule.

12.    The one hundred twenty (120) day "pay and investigate" provision is found in Fla. Stat.

§440.20(4)(1994).[15] The Court has held that from the initial provision of care, an E/C is under

the obligation to either: (1) provide an injured worker with benefits under the workers'

compensation law, or (2) to deny the compensability of that injured worker's injuries, or (3) to

accept responsibility/compensability and reserve their right to deny the claim within the 120 days

allowed by law to "pay and investigate." Bynum Transport Inc. v. Snyder, 765 So.2d 752 (Fla.

1st DCA 2000), Franklin v. Northwest Airlines, 778 So.2d 418 (Fla. 1st DCA 2001), and Garner

v. Clay County Dist. School Bd., 798 So.2d 821 (Fla. 1st DCA 2001)("A carrier that fails to deny

---

[15]    Fla. Stat. §440.20(4): "If the carrier is uncertain of its obligation to provide benefits or
compensation, it may initiate payment without prejudice and without admitting liability. The
carrier shall immediately and in good faith commence investigation of the employee's entitlement
to benefits under this chapter and shall admit or deny compensability within 120 days after the
initial provision of compensation or benefits. *Upon commencement of payment*, the carrier shall
provide written notice to the employee that it has elected to pay all or part of the claim pending
further investigation, and that it will advise the employee of claim acceptance or denial *within 120
days*. A carrier that fails to deny compensability *within 120 days after the initial provision of
benefits or payment of compensation* waives the right to deny compensability, unless the carrier
can establish material facts relevant to the issue of compensability that it could not have
discovered through reasonable investigation within the 120-day period." (emphasis added).

compensability within 120 days after the initial provision of benefits or payment of compensation

waives the right to deny compensability, unless the carrier can establish material facts relevant to

the issue of compensability that it could not have discovered through reasonable investigation

within the 120-day period). After trial, see footnote 1, the Employer/Carrier submitted

correspondence apparently intended as a supplemental authority or closing argument (it is unclear

why a letter would be used rather than some form of pleading). Attached thereto and referenced

therein is the Court's analysis in Cole v. Fairfield Communities, (Fla. 1st DCA 2005). In that

case, the carrier made payment for care associated with a cervical injury not related to the injured

workers' work accident. The injured worker argued that the cervical injury was thereafter

compensable as the carrier failed to deny compensability within 120 days of making that payment

for cervical care. The JCC concluded, and the Court affirmed, that the evidence in that case

supported that the payment for cervical care was inadvertently and mistakenly made. That

conclusion was based upon the "specific" testimony of the adjuster assigned:

> that he never considered the neck injuries compensable, that someone else in his office
> erroneously sent the lone payment to the chiropractor, and that he himself called the
> chiropractor's office and informed them that the chiropractor was not authorized to treat
> the claimant.

There is no such evidence in this record. The evidence in this case supports that there is no

medical care, other than monitoring, for the asbestosis condition which Claimant suffers. See,

Florida Power Corp. v. Brown, 863 So.2d 364 (Fla. 1st DCA 2003). The Evidence supports that

the Employer has access to a physician (Dr. Weaver) who has been involved in this claim and has

participated in referring Claimant for medical evaluation (with Dr. Fay).[16] Presumably, Dr.

Weaver possesses the knowledge, training, and expertise to know that there is no treatment for

---

[16]     Dr. Vernali's testimony supports that Claimant was referred to him by "the doctor at Solutia."
This supports that Dr. Weaver or some other doctor acting on behalf of the Employer was
involved with the referral to Dr. Vernali.

asbestosis, of the severity (Grade One, or "minimal") that Claimant suffers.[17] The

Employer/Carrier in this case nonetheless has authorized Dr. Vernali to provide medical care for

Claimant's pulmonary condition. The payment ledger in evidence supports that payments were

made to Dr. Vernali for services on:

> September 5, 2002 (1)
> September 9, 2002 (2)
> September 19, 2002 (3)
> October 17, 2002 (4)
> November 14, 2002 (5)
> December 5, 2002 (6)
> January 2, 2003 (7)
> January 30, 2003 (8)
> March 27, 2003 (9)
> April 24, 2003 (10)
> May 29, 2003 (11)
> June 26, 2003 (12)
> September 5, 2003 (13)
> October 30, 2003 (14)
> January 1, 2004 (15)
> February 19, 2004 (16)
> July 5, 2005 (17)

Thus, the Carrier herein has provided care and treatment with Dr. Vernali on at least seventeen

(17) occasions, over a period of three (3) years prior to the final hearing. Correspondence in Dr.

Vernali's records supports that the E/C inquired on more than one occasion regarding whether

Claimant's restrictions were related to the COPD or the asbestosis. At least one inquiry came

from a medical professional, RN Carnley, who was working on the E/C's behalf. It does not

appear that either the E/C's registered nurse, Mr. Carnley, or their doctor, Dr. Weaver, ever

inquired regarding whether the medical care being rendered was related to the COPD, the

asbestosis, or both. Dr. Vernali's testimony supports that at least by February 2003 he was

---

[17]     It is certainly debatable whether the objective medical evidence supports that Claimant has a
compensable asbestosis condition at this time. See, Florida Power Corp. v. Brown, 863 So.2d 364
(Fla. 1st DCA 2003). However, the Employer/Carrier stipulated that Claimant suffers this disease
and that it is compensable. That stipulation is afforded great deference as all stipulations in
workers' compensation proceedings are. See, Citrus World Inc. v. Mullins, 704 So.2d 128 (Fla.
1st DCA 1997). Therefore, the issue of the compensability of the asbestosis condition is not
before me.

prescribing medication for Claimant's COPD. It is unclear whether the Carrier paid for that medication. The payment ledger in evidence lists payments to Tymses, Apollo, and Accumed. However, there is no evidence that those payments were for medication or that such medication was prescribed by Dr. Vernali. Dr. Vernali prescribed a nebulizer for Claimant's use and that this device is strictly for Claimant's COPD. Claimant testified that she has used that machine. Claimant was using that machine in September 2003 when she last worked at the Employer. The evidence does not support that the E/C has denied the compensability of that machine or the other treatment rendered by Dr. Vernali within 120 days of the initial provision of the treatment recommended, prescribed and rendered by Dr. Vernali. I conclude that this claim is controlled by the 120 day rule and the Court's analyses in Bynum Transport Inc. v. Snyder, 765 So.2d 752 (Fla. 1st DCA 2000), Franklin v. Northwest Airlines, 778 So.2d 418 (Fla. 1st DCA 2001), and Garner v. Clay County Dist. School Bd., 798 So.2d 821 (Fla. 1st DCA 2001); Hutchinson v. Lykes Smithfield Packing, 870 So.2d 144 (Fla: 1st DCA 1004). I reject that this claim is controlled by Cole, because the record before me lacks the specific testimony which excused the E/C's single mistaken payment in that case. I find Garner particularly relevant to, and similar to, the facts of this case. There, the Judge denied application of the 120 day rule, in part, because the E/C "did not *knowingly* pay any benefits related to asthma" (emphasis added). That conclusion was rejected by the Court, in reversing the JCC. In Garner, the E/C paid for care for Claimant's non-work related asthma and later sought to disavow responsibility for that condition. The evidence supported that the Asthma condition was not compensable. The E/C was liable, however, because it cared for that condition in excess of 120 days and then sought to deny. The E/C before me in this record essentially seeks to defend responsibility for Claimant's COPD on the same grounds. I conclude the E/C has accepted that condition as compensable and has not made the requisite showing that they have now discovered information which could not have been discovered within 120 days. See, Fla. Stat. §440.20(4). Hutchinson is likewise very similar to

the situation presented in this case. I find the factual situations in <u>Hutchinson</u> and <u>Garner</u> indistinguishable from the case before me. Therefore, these holdings are controlling authority and the E/C is estopped from denying the compensability of the COPD they have paid to treat for three (3) years.

13.   Mr. Gilmartin's uncontroverted testimony establishes that Claimant would be determined "disabled" at step four (4) of the five (5) step sequential process for disability determination employed by the SSA (see footnote 12). He testified that this would be the conclusion based solely upon the restrictions/limitations imposed by Dr. Vernali for Claimant's pulmonary conditions. Concededly, those restrictions/limitations are primarily or even wholly the results of the COPD condition which was caused by Claimant's tobacco abuse and not by any work place exposure or event. However, the Employer's decision to pay for care and treatment of that COPD through worker's compensation over a period in excess of three (3) years renders that wholly personal condition compensable by law. Therefore the restrictions/limitations associated with the COPD condition are likewise compensable. I accept and adopt the opinions of Dr. Vernali, the physician selected and authorized by the Employer in this case. I accept the uncontroverted opinions of Mr. Gilmartin that Claimant would be found "disabled" by the SSA based upon Dr. Vernali's assigned restrictions/limitations associated with Claimant's compensable pulmonary conditions.

14.   Such proof does not, per se, entitle an injured worker to PTD benefits. This proof (e.g. "catastrophic") by an injured worker merely creates a rebuttable presumption of entitlement to PTD benefits. The statutory language (Fla. Stat. §440.15(1), see footnote 10) continues, to delineate the burden which is then upon the Employer/Carrier once Claimant makes this demonstration of "catastrophic injury." The finding of entitlement to Social Security "shall, in the absence of conclusive proof of a substantial earning capacity, constitute permanent total disability." This language thus creates an "affirmative defense to the E/C's liability for PTD."

See, Home Depot v. Turner, 820 So.2d 1075, 1076 (Fla. 1st DCA 2002); see also, Bob Wilson
Dodge v. Mohammed, 692 So.2d 287, 289 (Fla. 1st DCA 1997). In Turner, the court held that
"the E/C had the burden to demonstrate, by the conclusive proof required statutorily, that
claimant maintained a substantial earning capacity despite her impairment," once the injured
worker had proven "catastrophic injury." The E/C herein did not plead that affirmative defense.
Furthermore, I find that this record does not contain competent evidence of "substantial earning
capacity," and so the presumption of entitlement to permanent total disability benefits (Fla. Stat.
§440.15(1), see footnote 10) would control.

15.   On these findings, it is appropriate to award permanent total disability benefits. The question
      then arises as to what date those benefits are due from (i.e. when did Claimant's claim therefore
      become ripe?). Claimant seeks such benefits from September 3, 2003. The injured worker must
      reach maximum medical improvement ("MMI") before she is eligible to receive PTD benefits.
      Rivendell of Ft. Walton v. Petway, 833 So.2d 292 (Fla. 1st DCA 2002); Metropolitan Title &
      Guar. Co. v. Muniz, 806 So.2d 637 (Fla. 1st DCA 2002); Chan's Surfside Saloon v. Provost, 764
      So.2d 700 (Fla. 1st DCA 2000) (reversing award of PTD benefits absent competent substantial
      evidence that claimant had reached psychiatric MMI or would remain permanently and totally
      impaired when she did reach MMI); City of Pensacola Firefighters v. Oswald, 710 So.2d 95 (Fla.
      1st DCA 1998). Dr. Vernali did not testify that Claimant has reached MMI. Dr. Vernali's
      medical records do not document Claimant having reached MMI. It is the maximum medical
      improvement ("MMI") date upon which such a claim for PTD would be ripe. Rivendell, Muniz,
      Chan's. There is no competent evidence to support that Claimant was MMI as of September 3,
      2003.

16.   MMI is a medical determination. Kilbourne & Sons v. Kilbourne, 677 So.2d 855 (Fla. 1st DCA
      1995); King v. Scotty's Distribution Center, 699 So.2d 308 (Fla. 1st DCA 1997); Hood v. Pinellas
      County School Bd., 674 So.2d 816 (Fla. 1st DCA 1996); Espinal v. Victor Herrera Drywall

Stockers, Inc., 610 So.2d 660 (Fla. 1st DCA 1992). The Court has held that a finding of MMI "should ordinarily be based upon a clear, explicit expression of that fact set forth in medical records or medical opinion testimony." Espinal v. Victor Herrera Drywall Stockers, Inc., 610 So.2d 660 (Fla. 1st DCA 1992); Kilbourne at 859. In claims for permanent total disability, there is a "narrow exception to this rule" where, six weeks before the termination of temporary benefits has expired under the 104-week rule, a qualified professional is able to determine that the claimant will be permanently impaired once MMI is attained and, if so, to assign a prospective impairment rating. City of Pensacola Firefighters v. Oswald, 710 So.2d 95, 97-98 (Fla. 1st DCA 1998). In Emanuel v. David Piercy Plumbing, 765 So.2d 761 (Fla. 1st DCA 2000), the Court stated that a claimant can be considered at "statutory" MMI and, thus, entitled to permanent benefits for continuing disability "once a claimant's medical condition has improved as much as is reasonably expected under available and recommended remedial treatments." Id. at 762. The Court in Rivendell of Ft. Walton v. Petway, 833 So.2d 292 (Fla. 1st DCA 2002) held that "this represents another means of establishing MMI, aside from the more obvious one where a qualified professional opines that a claimant has reached "medical" MMI. Dr. Vernali has periodically imposed work restrictions and even excused Claimant from work for some periods since he began treatment for her pulmonary condition. His testimony supports the following:

> September 5, 2002 initial evaluation.
> January 2, 2003 released to light work.
> January 30, 2003 specific work restrictions imposed.
> February 27, 2003 work restrictions continued.
> May 29, 2003 Claimant excused from work.
> June 26, 2003 Claimant to remain excused from work.
> September 4, 2003 Claimant to remain excused from work.
> September 5, 2003 Claimant released to return to work with restrictions.

Claimant's testimony supports that the last day she worked was September 2, 2003. Dr. Vernali's testimony supports that Claimant has remained under those work restrictions since that time. Therefore the evidence supports that Claimant was excused from work for fourteen (14) weeks

(May 29, 2003 through September 5, 2003). The evidence further supports that Claimant was under work restrictions and therefore eligible for temporary partial disability ("TPD") benefits from September 5, 2003 through the final hearing on September 19, 2005. This was a period of one hundred six (106) weeks. The issue is not whether Claimant was "entitled" to TPD for that one hundred six (106) weeks. Whether she was entitled to those benefits would depend upon her demonstration that her loss of earnings was a result of those work restrictions. Vencor Hosp. v. Ahles, 727 So.2d 968 (Fla. 1st DCA 1998). That issue is not before me. It remains that Claimant was "eligible" for that one hundred six (106) weeks, and so her eligibility for temporary benefits has expired by the passing of that eligibility and the passing of the eligibility for fourteen (14) weeks of temporary total disability (TTD). Oswald. The competent evidence supports that Claimant has exhausted her one hundred four (104) weeks of eligibility for temporary indemnity benefits. Dr. Vernali's testimony supports that Claimant's condition is not expected to improve, in fact he predicts that both pulmonary conditions will continue to deteriorate. His testimony does not support that this deterioration is quantitatively predictable or certain, but clearly he predicts and expects continued deterioration. I accept and adopt those opinions. The totality of the evidence supports that Dr. Vernali expects Claimant's restrictions/limitations to continue on a permanent basis and to progress to the point at which he would excuse her from work on a permanent basis. I conclude that the totality of the evidence in this record supports that Claimant has reached "statutory MMI." Emanuel v. David Piercy Plumbing, 765 So.2d 761 (Fla. 1st DCA 2000).[18] Her claim for permanent total disability is therefore ripe pursuant to the "narrow exception" recognized in City of Pensacola Firefighters v. Oswald. I find that this exception is not dependent upon the assignment of an impairment rating, but only upon the continuing and

---

[18]     I conclude this from the totality of the evidence and the Court's holdings that "magic words" are not necessary to establish statutory standards such as this. See, AT & T Wireless Services, Inc., v. Castro, 896 So.2d 828 (Fla. 1st DCA 2005); see also, Hunt v. Exxon Co. USA, 747 So.2d 966, 973 (Fla. 1st DCA 1999).

permanent nature of the restrictions and limitations. It is those limitations/restrictions which

result in the SSA conclusion of disabled; and it is therefore those limitations/restrictions which

create the (unrebutted on this record) presumption of entitlement to PTD benefits. The evidence

in this record supports that Claimant became eligible for temporary indemnity benefits on May

29, 2003.[19] One hundred four (104) weeks later occurred on May 26, 2005. The totality of the

evidence therefore supports that Claimant reached "statutory MMI" on May 26, 2005. Emanuel.

Therefore her claims for permanent total disability benefits for the period September 3, 2003

through May 25, 2005 are appropriately denied. Her claims for PTD benefits from May 26, 2005

through September 19, 2005 and continuing are appropriately granted.

17.    Based upon the findings above regarding the compensability of the pulmonary conditions,

Claimant is entitled to care and treatment for the pleurisy (chest wall pain/discomfort) which she

suffers secondary to coughing from the COPD and the asbestosis. However, the competent

evidence does not support that Claimant suffered any discreet injury by accident on September 2,

2003. Likewise, the competent evidence does not support that Claimant was last injuriously

exposed to asbestos or other deleterious substance on September 2, 2003 or that any compensable

event occurred that day. See, Fla. Stat. §440.151. Therefore, Claimant's claim for a

determination of the compensability of some action or event on September 2, 2003 is

appropriately denied. That does not necessarily mean that September 2, 2003 is not the "date of

disability" or that this date is legally irrelevant or insignificant. However, on the record before

me, no such legal or factual significance to this date has been competently demonstrated.

---

[19] There is evidence that she was under work restrictions prior thereto, but no competent evidence that she suffered any loss of earnings or missed any work prior to May 29, 2003. Evidence of excuse from work demonstrates eligibility for TTD. Evidence of restrictions coupled with unemployment demonstrates eligibility for TPD. For the period before May 29, 2003 Claimant has not proven unemployment or underemployment caused by restrictions/limitations, and so the time prior to May 29, 2003 cannot be counted in calculating the 104 week period.

Fannie Ranaldson v. Solutia and Broadspire                                    Page 20 of 21
Final Order                    OJCC Case No. 05009021DWL           October 10, 2005
                            OJCC Case No. 05009023DWL

Wherefore, it is ORDERED AND ADJUDGED:

1.   .   Claimant's claim for permanent total disability for the period September 3, 2003 through May 25, 2005 is DENIED.  As to this claim, the Employer/Carrier shall go forth without day.

2.      Claimant's claim for permanent total disability for the period May 26, 2005 through September 19, 2005, along with statutory permanent total disability supplemental benefits is GRANTED. Claimant is entitled to penalties and interest on these benefits, and same are GRANTED. Claimant is entitled to attorney's fees and taxable costs for the prosecution of these benefits, and same are GRANTED.   Jurisdiction is reserved for determination of the appropriate amount or such fees and taxable costs.

3.   .   Claimant's claim for compensability of her alleged accident/injury of September 2, 2003 is DENIED.  As to this claim, the Employer/Carrier shall go forth without day.

DONE AND ORDERED in Chambers, Pensacola, Escambia County, Florida, this  10th  day of October, 2005.

# S.

JUDGE OF COMPENSATION CLAIMS

**CERTIFICATE**

This is to certify that the above **FINAL ORDER DENYING COMPENSABILITY OF ALLEGED ACCIDENT OF SEPTEMBER 2, 2003, DENYING SOME PERIODS OF PERMANENT TOTAL DISABILITY BENEFITS AND GRANTING OTHER PERIODS OF PERMANENT TOTAL DISABILITY BENEFITS, PENALTIES, INTEREST, COSTS AND ATTORNEYS FEES** was entered on the date stated, and that copies were mailed to the parties counsel as set forth below.

_____
Assistant to the Judge of Compensation Claims

John Wesley
88 N.E. Eglin Pkwy
Ft. Walton Beach, FL 32548

Thomas Condon
P.O. Box 12431
Pensacola, FL 32592-2431

Fannie Ranaldson v. Solutia and Broadspire
Final Order                    OJCC Case No. 05009021DWL
                               OJCC Case No. 05009023DWL

Page 21 of 21
October 10, 2005